Kelly SPAIN, Appellant,

v.

The STATE of Texas, Appellee.

No. 57872.

Court of Criminal Appeals of Texas,
Panel No. 2.

June 6, 1979.

Rehearing En Banc Denied Sept. 19, 1979.

Charles W. Fairweather, Amarillo, for appellant.

Tom A. Curtis, Dist. Atty., and David L. Gleason, Asst. Dist. Atty., Amarillo, Robert

Huttash, State's Atty., Austin, for the State.

Before DOUGLAS, TOM G. DAVIS and DALLY, JJ.

## OPINION

TOM G. DAVIS, Judge.

Appeal is taken from conviction for theft over $10,000. V.T.C.A. Penal Code, Sec. 31.03. Punishment was assessed by the jury at ten years, with the recommendation of probation.

Appellant contends that the trial court's refusal to allow cross-examination of the State's witness Garret Gilmore, in order to establish his bias or motive in testifying, denied appellant his constitutional right to confrontation. U.S.Const. Amend. VI; Tex.Const., Art. I, Sec. 10. The evidence germane to disposition of this contention will be reviewed below.

Appellant's wife, Peggy Spain, was employed by Producer's Grain Corporation (Producer's) as a secretary. Her duties included countersigning checks issued by Producer's to pay the ongoing expenses and purchases of the business. James Warwick was bookkeeper and office manager for Producer's in the office in which Peggy Spain worked, and was also responsible for cosigning checks.

According to Warwick, Peggy Spain came to him and asked to borrow money from Producer's to pay some pressing obligations. Warwick testified that he was unable to loan her any money from company funds, but upon her suggestion entered into a scheme with Peggy Spain to defraud the company of the needed funds. Warwick contacted Garret Gilmore to help with this scheme. Gilmore agreed to set up a bank account in which he was to deposit checks that Warwick would issue on Producer's account, countersigned by Peggy Spain. These checks were first issued as payment for non-existent building supplies. Later, the checks were issued as payment for cattle feed which was never received.

Gilmore would deposit the checks to his account, and then write checks payable to Warwick, Peggy Spain and appellant. A total of $658,000.00 was obtained from Producer's in this manner. Warwick estimated that of this total he received approximately $175,000.00, his brother $5,000.00, Gilmore approximately $100,000.00, and Peggy Spain and appellant approximately $350,000.00.

Gilmore testified extensively regarding his part in the offense. He stated that he acted as a conduit for the embezzled funds. At the end of his direct testimony, the jury was retired and the defense counsel made the following request:

"MR. FAIRWEATHER: Your Honor, the Defense would propose to ask the following questions of the witness, Garret Gilmore, for two purposes.

"Number One, we wish to question the witness concerning his reasoning and motivation for testifying for the prosecution, to the effect to see whether or not there is any agreement implied or expressed between him and the District Attorney's Office in return for his testimony. And I think this testimony is relevant under the holding of the Burkhalter Case, as to the bias or prejudice of a witness.

"We further wish to ask this witness whether or not he was convicted of the offense of theft over $10,000.00, and whether or not he received a punishment of a judgment for five years Probation in this case. We think this is relevant under the ordinary rules of impeachment of a witness.

"THE COURT: All right. Fine."

Gilmore testified outside the presence of the jury that he was arrested for his part in the instant offense and remained in jail for four or five hours. He was freed on a pre-trial release. The gist of the remainder of his testimony is revealed by the following excerpts:

"Q. You turned yourself in approximately one week after the theft had been discovered by PGC, didn't you?

A. I am not sure.

Q. Approximately?

A. I don't remember, really remember the dates.

Q. Even if you don't remember the dates, when you turned yourself in, didn't you know that PGC already knew about it?

A. No, sir.

Q. Had you talked to Mr. Warwick about turning yourself in?

A. A little bit.

Q. What did you say to him?

A. I don't really remember.

Q. What did he say to you?

A. I don't really remember.

Q. You remember the substance of it, even if you don't remember the details of it?

A. We were both—he wasn't sure what he was going to do, and I wasn't sure.

Q. You had been doing this about two yours. What caused you to get this change of heart?

A. I had been thinking about it through over the past year, with everything was getting too big, and all of the checks were large checks, and both me and James had discussed it frequently over quitting, and stopping it. But each time there was another check would come in.

Q. Did your attorneys approach the office of the District Attorney of Potter County?

A. I believe so.

Q. Did they approach them with reference to what is called plea bargaining, or recommendations from the District Attorney's Office?

A. I have no idea.

Q. Did, in fact, the District Attorney's Office make a recommendation in your case of five years probation?

A. As far as I know, no.

Q. You were in Court.

A. In the Court case?

Q. Uh-huh.

A. I don't really remember. I don't think so.

Q. You want the Court Reporter to go get the record out and check it? Is that necessary?

A. Yes, sir.

Q. We would ask the Court Reporter to check out that Statement of Facts now on that recommendation, unless the District Attorney is willing to concede that he did make that recommendation.

MR. GLEASON: I feel relatively certain that I did make a recommendation in that case. I have a transcript of that proceeding. I don't know that I have a recommendation appearing in the transcript.

Yes, Your Honor, he is more likely to refresh his memory from a transcript. It is on Page 25.

Q. (By Mr. Fairweather) Do you want to refresh your memory starting at Page 25, and continuing thereafter?

Does that refresh your memory?

A. Yes, sir.

Q. Now, answer the question, did the District Attorney's Office make a recommendation in this case of five years Probation?

A. Yes, sir.

Q. Okay. And when you walked through those doors of that Courtroom, you knew he was going to make that recommendation, didn't you?

A. No, sir.

Q. Your attorney had already told you if you pleaded guilty, the DA would recommend five years probation, hadn't he?

A. No, sir.

Q. What did you think was going to happen when you walked in here?

A. I had no idea.

Q. Didn't the District Attorney and the Judge tell you that any recommendation by the prosecuting attorney was not binding on him?

A. No, sir."

\* \* \* \* \* \*

Q. (By Fairweather) The day you were arrested, you talked to Mr. Gleason in some detail. About how long an hour, thirty minutes, or what?

A. About an hour and a half.

Q. Part of your conversation was reduced to writing?

A. No, sir. To my knowledge, it wasn't, but I don't know.

Q. Did you give him a written statement or not?

A. I did give him a written statement. It was written by me before I was arrested.

Q. Did you give it to your lawyer before you gave it to Mr. Gleason?

A. Yes.

Q. What was your lawyer doing for you, if he wasn't up there trying to make a deal so you wouldn't go to prison?

A. I don't know.

Q. Isn't that what you hired him for?

A. I am not sure.

Q. You are not sure why you hired him?

A. No.

Q. What did you pay him?

A. I don't remember. I am still in the process of paying him.

Q. What did he charge you?

A. I don't really remember. It was around—

MR. FAIRWEATHER: Your Honor, I think the witness is obviously being evasive, and refuse to answer, and I would like the Court to instruct him.

THE COURT: Yes, I think I would instruct you, sir, to be more candid with the answers you give here in this matter.

A. I think it was around 10,000.

Q. Why didn't you answer that earlier when I asked you?

A. I didn't really remember exactly what the amount was.

Q. Did the Judge refresh your memory for you?

A. A little."

\* \* \* \* \* \*

Q. When did you first agree to testify for the prosecution in this case?

A. It was after the trial.

Q. Are you going to state in this Court that no mention was ever made to you about testifying for the prosecution until after your trial? You are under oath.

A. As far as I can remember.

Q. You think carefully.

A. As far as I can remember, it was after.

Q. Isn't it true that you agreed that you would testify for the prosecution in return that they would recommend five years probation?

A. No, sir."

\* \* \* \* \* \*

"Q. In any event, you were convicted of theft, and plead guilty, and you received a five years probated term; isn't that true?

A. Yes, sir."

On cross-examination, still outside the presence of the jury, Gilmore testified as follows:

"Q. Did your attorneys, either Mr. Urmy or Mr. Heacock, represent to you that by doing that, that this office would make a recommendation in your case, or the Judge would be more lenient on you?

A. No, sir.

Q. At anytime prior to your trial?

A. No, sir. The only thing that I was ever told that there was a chance

for probation, but I was never told that.

Q. When were you told that?

A. It was around the time of the trial, I believe it was.

Q. Who told you, if you remember?

A. One of my attorneys.

Q. There was a chance that you might get probation?

A. Yes, sir.

Q. And you didn't know at the time you plead guilty that I was going to make a recommendation in your case?

A. No, I did not.

Q. And after you had plead guilty, and after you had received your probation, your probated sentence, did we have a discussion here in the Courtroom?

A. I think so. I am not sure.

Q. Do you recall what was said?

A. No.

Q. Do you recall whether any discussion was had as to your employment, whether you could make restitution and how much?

A. Yes, that was—restitution was discussed.

Q. When did you and I discuss your testifying in any of these criminal cases against the other Defendants?

A. I believe it was right before the time or right around the time I receive that first Subpoena.

Q. And, of course, at this point of time, your case has been disposed of, and you know (sic) longer have a Fifth Amendment privilege, is that correct?

A. I am not sure.

Q. You have already plead guilty of your involvement in this crime?

A. Yes, sir.

Q. You can't be convicted of it again?

A. I don't think so. I am not sure."

Defense counsel then asked to develop this testimony in the jury's presence. The court recessed for the day, and the following occurred the next morning:

"MR. FAIRWEATHER: May it please the Court, Your Honor, yesterday I presented questions to the Court outside the presence of the Jury to the witness, Garret Gilmore, and the Court announced that the questions would be considered proper for cross examination before the Jury.

THE COURT: Yes, sir.

MR. FAIRWEATHER: Since then, the Court has modified its order, and has stated to Counsel for the Defendant that the questions concerning any plea bargaining between Garret Gilmore and the District Attorney's Office are not admissible before the Jury, and we will not be able to ask the witness, Garret Gilmore, whether or not he was given a five year probated term for his plea of guilty.

THE COURT: However, you will be able to show that he was found guilty."

Appellant then examined this witness in the presence of the jury. Gilmore admitted that he had been convicted, but the punishment was not revealed. No further testimony was elicited as to the questions asked on voir dire of this witness.

Appellant contends that he should have been able to cross-examine Gilmore regarding the probated sentence in order to show his bias and motive to testify. Appellant relies on *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) as authority for his assertion that the trial court's action denied him his constitutional right to confrontation. His reliance is well founded.

In *Davis*, the trial court had refused to allow the defendant to cross-examine the State's chief witness to show that he was on probation at the time he made his initial identification of the defendant. The defense theory was that because the witness was on probation the jury could infer that the witness was under some pressure to make an identification. The Supreme Court reversed, holding that the defendant should have been able to present the evidence to the jury for whatever value it

might have had. *Davis v. Alaska*, 415 U.S. at 318, 94 S.Ct. 1105.

■ In *Simmons v. State*, 548 S.W.2d 386, this Court reviewed previous cases involving the denial of cross-examination, and concluded:

"These cases underscore the well-established rule (and exception to Art. 38.29, V.A.C.C.P.) that great latitude is allowed the accused in showing any fact, including pending charges, which would tend to establish ill feeling, bias, motive, and animus on the part of any witness testifying against him."

The erroneous denial of this right to confrontation is "constitutional error of the first magnitude and no amount of showing of want of prejudice [will] cure it." *Davis v. Alaska*, 415 at 318, 94 S.Ct. at 1111; *Evans v. State*, Tex.Cr.App., 519 S.W.2d 868.

■ We hold that the trial court's refusal to allow the appellant to show that Gilmore had received a probated sentence is reversible error.

■ Appellant further contends that the trial court's refusal to allow him to question Gilmore regarding any plea bargain was erroneous. The State counters that since the examination of the witness outside the presence of the jury revealed no evidence of such a bargain, the trial court properly denied appellant the opportunity to propound these questions in the presence of the jury.

In *Alford v. United States*, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931) the Supreme Court reviewed a trial court's refusal to allow the defendant to elicit the witness' current address. The Supreme Court stated:

" 'It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop. Prejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them. . . . To say that prejudice can be established only by showing that the cross-examination, if pursued, would necessarily have brought out facts tending to discredit the testimony in chief, is to deny a substantial right and withdraw one of the safeguards essential to fair trial.' 282 U.S. at 692, 51 S.Ct. at 219."

See *Saunders v. State*, 572 S.W.2d 944.

Just as *Alford* held that the defendant is not required to show what facts the cross-examination would have revealed in order to establish prejudice, the appellant in the present case is not required to show that his cross-examination would have affirmatively established the facts sought.

■ An effective cross-examination encompasses more than just the opportunity to elicit testimony to establish the existence of certain facts. The cross-examiner should be allowed to expose the limits of the witness' knowledge of relevant facts, place the witness in his proper setting, and test the credibility of the witness. The failure to affirmatively establish the fact sought does not prevent the cross-examination from having probative value in regard to the witness' credibility. An unbelievable denial of the existence of a fact can be even more probative as to lack of credibility than an affirmative admission of the fact.

We hold that the trial court erred in limiting the cross-examination of Gilmore under the facts of this case.

The judgment is reversed and the cause remanded.