Todd R. RANKIN, Appellant,

v.

The STATE of Texas, State.

No. 2–98–192–CR.

Court of Appeals of Texas,
Fort Worth.

March 15, 2001.

Danny D. Burns, Fort Worth, Attorney for Appellant.

Tim Curry, Crim. District Atty.; Charles M. Mallin, Ass't D.A., Chief of Appellate Section; Tanya S. Dohoney, Jay Lapham, Ass't District Attorneys, Fort Worth, Attorneys for Appellee.

Panel B: DAY, DAUPHINOT, and HOLMAN, JJ.

## OPINION

DAUPHINOT, Justice.

### INTRODUCTION

A jury convicted Appellant Todd Rankin of knowingly, by omission, causing serious bodily injury to a child under the age of fifteen.[1] The specific manner and means alleged in the indictment and found by the jury were "by failing to cover a septic tank containing liquid, at a time when the Defendant had assumed care, custody, or control of [the child] or had a legal duty to act because the Defendant was the father of [the child]." The jury sentenced Appellant to twenty years' confinement in the Insti-

tutional Division of the Texas Department of Criminal Justice and affirmatively found that the septic tank was a deadly weapon. Appellant brings twelve points on appeal, challenging the sufficiency of the evidence, the denial of a charge on the lesser included offense of criminally negligent injury to a child, the exclusion of impeachment evidence, and the erroneous admission of extraneous conduct evidence. Finding no reversible error, we affirm.

### SUMMARY OF FACTS

On February 8, 1996, two-year-old Joseph Rankin drowned in a septic tank in the backyard of his house. Appellant was Joseph's father; Jill Rankin (Jill) was Joseph's mother. Five months before Joseph's death, a police officer had gone to the Rankin home to investigate complaints that Joseph often wandered alone on a busy street near his home. Neighbors, police officers, Child Protective Services (CPS) workers, and Volunteers of America (VOA) workers testified that the house was filthy and unsafe. There was testimony of exposed wiring, holes in the walls and ceilings so big you could see outside, animal feces on the floors, roaches in the refrigerator and kitchen cabinets, and a noxious odor throughout the house.

The evidence showed that Appellant had worked on the septic tank numerous times, but had not successfully repaired it. There was evidence that the tank's cover had been off for some time and that friends had warned Appellant not to leave the septic tank uncovered. Testimony revealed that Appellant and Jill thought Joseph was in his room until Appellant discovered the child in the septic tank. Over objection, Alma Abreo, a neighbor of the Rankins', testified that Appellant had once told her that he was sick of his children

---

1. *See* TEX. PENAL CODE ANN. § 22.04 (Vernon Supp.2001).

and that he "would take out his kids one by one and make it look like an accident."

Dr. Gary L. Sisler, the deputy medical examiner, determined that the cause of Joseph's death was by drowning in a septic tank. Although initially ruled accidental, the deputy medical examiner and chief medical examiner changed the manner of death to "undetermined" upon receiving Abreo's sworn statement.

Appellant was charged with intentionally or knowingly causing injury to a child by omission, under section 22.04 of the Texas Penal Code.[2] Prior to trial, however, the State waived the intentional portion of the indictment and proceeded on the culpable mental state of "knowing."

## SUFFICIENCY OF THE EVIDENCE

In his first four points, Appellant challenges the legal and factual sufficiency of the evidence to support the jury's verdict. In particular, Appellant argues that the evidence is insufficient to prove that he acted knowingly.

## STANDARD OF REVIEW—LEGAL SUFFICIENCY

In reviewing the legal sufficiency of the evidence to support a conviction, we view the evidence in the light most favorable to the verdict.[3] The critical inquiry is whether, after so viewing the evidence, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[4] This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.[5] Our duty is not to reweigh the evidence from reading a cold record but to act as a due process safeguard ensuring only the rationality of the fact finder.[6] The verdict may not be overturned unless it is irrational or unsupported by proof beyond a reasonable doubt.[7] The standard for review is the same for direct and circumstantial evidence cases.[8]

## STANDARD OF REVIEW—FACTUAL SUFFICIENCY

In reviewing the factual sufficiency of the evidence to support a conviction, we are to view all the evidence in a neutral light, favoring neither party.[9] Evidence is factually insufficient if it is so weak as to be clearly wrong and manifestly unjust or the adverse finding is against the great weight and preponderance of the available evidence.[10] Therefore, we must determine whether a neutral review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the verdict, or the proof of guilt, although adequate if taken alone, is greatly

2. TEX. PENAL CODE ANN. § 22.04.

3. *Cardenas v. State,* 30 S.W.3d 384, 389–90 (Tex.Crim.App.2000); *Narvaiz v. State,* 840 S.W.2d 415, 423 (Tex.Crim.App.1992), *cert. denied,* 507 U.S. 975, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993).

4. *McDuff v. State,* 939 S.W.2d 607, 614 (Tex. Crim.App.), *cert. denied,* 522 U.S. 844, 118 S.Ct. 125, 139 L.Ed.2d 75 (1997).

5. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

6. *Williams v. State,* 937 S.W.2d 479, 483 (Tex. Crim.App.1996).

7. *Matson v. State,* 819 S.W.2d 839, 846 (Tex. Crim.App.1991).

8. *Kutzner v. State,* 994 S.W.2d 180, 184 (Tex. Crim.App.1999).

9. *Johnson v. State,* 23 S.W.3d 1, 7 (Tex.Crim. App.2000); *Clewis v. State,* 922 S.W.2d 126, 129 (Tex.Crim.App.1996).

10. *Johnson,* 23 S.W.3d at 11.

outweighed by contrary proof.[11] In performing this review, we are to give due deference to the fact finder's determinations.[12] Consequently, we may find the evidence factually insufficient only where necessary to prevent manifest injustice.[13]

## DISCUSSION

 Sergeant R.D. Waters of the Benbrook Police Department testified that on September 8, 1995, while he was on routine patrol near the Rankins' house, a neighbor flagged him down to express her concern about a child who would often wander into the busy roadway. Sergeant Waters then went across the street to the house the neighbor indicated and spoke with a man there. The man, later identified as Appellant, told Waters that he was aware of the problem with the child wandering out into the street, and that he had put up a barrier in an attempt to restrain him. The barrier was a sheet of plywood about twenty-four to thirty inches tall. Still, Appellant explained, the child managed to get over the plywood and escape into the street. Waters left the house, but returned about two hours later after deciding to initiate an offense report against the child's parents. On this second visit, Sergeant Waters met Jill, Appellant's wife, who told the officer that she too was aware of the problem and that Appellant had erected a plywood barrier. Waters learned that the child's name was Joseph Rankin and that he was not yet two years old.

After Waters' visits, CPS referred the Rankin family to VOA for instruction in parenting skills. In 1996, Minnie Griffin, a family mentor with VOA, was assigned to the Rankin case. During her first visit to the Rankin home, Griffin observed that the house was in poor condition: there was a hole in the living room ceiling, electrical wiring hanging from the ceiling, general filth and disorder, and an unpleasant odor. Griffin returned a few days later and saw a child whom Jill was babysitting pulling things out of a garbage can. Griffin told Jill that she should be more vigilant of the children in her care. Griffin returned approximately twenty days later on February 8, 1996. At that time she discussed with Jill the odor throughout the house, as well as the necessity of making the home safe for children. Griffin testified that on none of her visits did she notice a safety hazard that would require removal of the children from the home. She also testified that on each of her visits she found Joseph to be a well-fed, healthy, and happy child. Furthermore, Griffin noted that Jill had attempted to straighten the house and that she never saw signs of physical abuse on Joseph.

Clinton Allen, a friend of Appellant, who at one time had stayed with the Rankin family in their home, testified that he had helped Appellant work on the septic tank in the past. The first time, they simply removed the lid, looked at the tank, and then re-covered the tank. Subsequently, Appellant asked Allen to help him empty out the septic tank, but Allen refused. Allen testified that he told Appellant three or four times that Appellant should keep the septic tank covered, and that he warned Appellant that someone was going to fall into the septic tank. Allen also testified to his belief that the open septic tank was dangerous, especially after dark.

Paula Elliot, an acquaintance of Appellant and Jill, testified that she had visited the Rankin home prior to February 8,

---

11. *Id.*

12. *Id.* at 8–9; *Clewis,* 922 S.W.2d at 136.

13. *Johnson,* 23 S.W.3d at 9, 12; *Cain v. State,* 958 S.W.2d 404, 407 (Tex.Crim.App.1997).

1996, where she observed that "the septic tank lid was off. It was backed up. I mean, it was nasty." Approximately three days before Joseph's death, Elliot called CPS to report the open septic tank in the Rankins' backyard. Elliot testified that she was concerned about the septic tank because "any person could fall into it, anybody, anything. They had animals, also, that could fall into it." While Elliot testified that she might have told Jill about her concerns, she admitted that she had not spoken to Appellant about the septic tank.

Cecil Braudway, another friend of Appellant, testified that he was at the Rankin home on the afternoon of February 8, 1996. Appellant was working on the septic tank because it was backed up. Braudway got a "snake" from his truck and watched as Appellant tried unsuccessfully to clean out the blocked pipe. When Appellant finished, Braudway asked about putting the lid back on the tank, but Appellant said he would do it later.

Back inside the house, Appellant played video games while Jill packed a diaper bag to go to the Braudways' house for dinner. Braudway testified that Joseph was running around the house playing until either Appellant or Jill sent him to his room. After some time passed, Jill remarked that Joseph was too quiet, and asked Appellant to check on him. Instead of going into Joseph's room, however, Appellant decided to check the septic tank first. There, according to Braudway, Appellant "saw what he thought was a bag or something and he got a stick and poked it and then realized it wasn't a bag and saw some shoes floating and then that's when he got down there and got it and found it was Joseph." Braudway heard Appellant cry out, "Oh, my gosh." Soon after, Appellant walked into the living room carrying Joseph in his arms, and saying in a frantic voice, "I think he's gone." Appellant and Jill went next door to call 911 while Braudway attempted to call for help on a CB radio.

Officer Jackie Deane of the Benbrook Police Department testified that she received a dispatch to the Rankin residence at approximately 7:00 p.m. on February 8, 1996. When she arrived, Appellant was standing outside. Officer Deane described Appellant as very calm. Appellant led the officer into the living room of the house where she saw a woman kneeling beside a child. The woman was crying and appeared to be very upset. When she saw Deane, the woman yelled, "help my son." Deane observed that the child was lifeless and unresponsive, and that his body was "very, very cold, just very cold" and "all wet, soaked." When Deane asked the woman how long the child had been "down," she replied that she did not know, and that she thought he was in bed. Although Deane, another police officer, and paramedics performed CPR, the little boy did not respond.

Officer James Mills was also dispatched to the Rankin home that night. Officer Mills testified that Appellant did not appear to be excited or upset when he observed him on the front porch of the house. After assisting with the CPR efforts, Mills went into the backyard to look at the septic tank. He described the yard as being very dark, with no external lighting. Mills then spoke with Appellant and asked him what had happened. Appellant told the officer that he thought Joseph was in bed. Appellant explained that he walked into the backyard, where he saw what looked to him like a plastic bag floating in the septic tank. Upon further examination, Appellant realized that it was Joseph. Appellant told Mills that he had been working on the septic tank and that the lid had been off for several days.

Officer Mills measured the depth of the liquid waste in the septic tank, which he

estimated to be about three or four feet. He also determined the approximate diameter of the septic tank to be between three to _ ⁻ feet. Based upon the condition of the disₚ ⁿd dirt next to the tank, Mills guessed thaᵢ the lid had been off for more than a couple of days. Mills testified that, in his opinion, the open septic tank in the Rankins' backyard was a "deadly weapon." According to the officer, the septic tank cover was propped up at an angle such that it looked like a slide.

Margaret Livesay, a CPS investigator, testified that she met with Appellant and Jill at the hospital later that night. Jill stated that Joseph had been running up and down the hall playing with matchbox cars while she packed the diaper bag. At some point, Joseph went into the bedroom to give his little brother a bottle. When everything got quiet, Jill believed that Joseph was asleep and did not check on him. Jill admitted that it had been forty-five minutes to an hour since she had last seen Joseph.

When Livesay interviewed Appellant separately, he agreed with his wife's statement that Joseph had been out of sight for at least forty-five minutes to an hour. Appellant stated that when he went to look for Joseph, he noticed that a door in the bathroom, which opened out onto the backyard, was open halfway. Appellant saw something white floating in the septic tank, which he thought was a bag. Upon further inspection, Appellant discovered that it was Joseph. Appellant told Livesay that the septic tank was about three feet wide, that it was located approximately six to seven feet away from the bathroom door, and that it was large enough for a full-grown person to fall into. Indeed, Appellant admitted that he had almost fallen into the open tank twice earlier that same day. Livesay also testified to her opinion that the uncovered septic tank in the Ran-kins' backyard posed a dangerous situation for a small child.

Alma Abreo, a neighbor of the Rankins', testified over defense objection to an encounter she had with Appellant in late 1995 or early 1996:

I was leaving my house to go to work and I live on the corner—like I said, I was leaving my house going down Williams Road to turn right and [Appellant] was standing there on the street waving me down to stop, so I stopped.

He said that he needed to take his wife to the hospital and he needed to take her. So I told him there was nothing I could do for him, as far as taking him, because I had to go to work.

He repeatedly got upset. He was mad. He was angry. He smelled of alcohol. I told him that I—there was nothing I could do.

He said he was sick, he was so sick of it. And I said, "What?" He said he was sick of kids, that he could not handle anymore, that he had just got rid of two in Florida, and that he was not—didn't want to have to deal with any more.

And the next thing I remember, I told him I had to go, and he got mad, started kicking my truck, and told me that he would take out his kids one by one and make it look like an accident.

I said, "Okay." I drove off. I didn't want to have anything else to do with it.

At the close of the evidence, the trial judge instructed the jury as follows:

[I]f you find and believe from the evidence beyond a reasonable doubt, that the Defendant, . . . knowingly, by omission, cause[d] serious bodily injury to Joseph Rankin, a child younger than 15 years of age, by failing to cover a septic tank containing liquid, at a time when the Defendant has assumed care, custody, or control of Joseph Rankin or had a

legal duty to act because the Defendant was the father of Joseph Rankin, ... then you will find the Defendant guilty of injury to a child.

The charge further instructed that "[a] person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." On the record before us, we cannot conclude that the evidence, both direct and circumstantial, is legally insufficient to support the jury's verdict. Nor can we conclude that the evidence is factually insufficient to sustain the verdict. There was evidence that Appellant was aware of the dangers posed by an open septic tank, and that his failure to cover the septic tank was reasonably certain to cause serious bodily injury to Joseph.[14] Accordingly, we overrule Appellant's first four points.

## EXCLUSION OF IMPEACHMENT EVIDENCE

In his sixth point, Appellant argues that the trial court erred in excluding impeachment evidence of one of the State's witnesses, Alma Abreo. On direct examination, the State asked Abreo if she "remember[ed] something unusual happening involving this Defendant either the end of '95 or the beginning of '96." Abreo replied that she did, and testified over objection that Appellant had told her of his intention to "take out his kids one by one and make it look like an accident."

## DISCUSSION

Outside the jury's presence, Appellant's counsel represented that Appellant claimed he had never seen Abreo before in his life. The State represented that Abreo was frightened of testifying against Appel-

lant and the State, therefore, did not want to reveal her parents' address. Abreo, however, testified that her family lived "around the corner" from Appellant and had lived there for "over 25, 24 years." Additionally, Abreo provided the exact address of her parents' home. Still outside the presence of the jury, Abreo admitted she did not remember exactly when she had the encounter with Appellant, but that it was eight [sic] years earlier in 1995, when she was seventeen [sic]. Abreo testified on April 8, 1998, and stated that she was twenty-five years old.

Before the jury, Abreo testified that she was on her way to work when Appellant waved her down and made the incriminating statement. Shortly after she heard about Joseph's death, thinking that what Appellant had said to her would be helpful to the State, she "went directly to the district attorney's office with [her] statement." Abreo also acknowledged that she was missing time from work by coming to court to testify, and stated that she had never testified in a court of law before.

On cross-examination, Abreo testified that Appellant had known her all of her life, but that she had known him for only about twelve years. When questioned about her employment history, Abreo stated that she had worked at her current job for the last six months, and that before this job she had attended college. When asked what college she attended, Abreo stated that she went to Aladdin Beauty College. Abreo testified that she worked for a telemarketing company while she was in college. When asked where she had worked before her telemarketing job, Abreo replied, "I'm not sure. I can't remember. I wouldn't want to perjure my-

---

**14.** *See* Tex. Penal Code Ann. § 6.03(b) (Vernon 1994); *Thornton v. State,* 994 S.W.2d 845, 849 (Tex.App.—Fort Worth 1999, pet. ref'd);

*Dusek v. State,* 978 S.W.2d 129, 134 (Tex. App.—Austin 1998, pet. ref'd).

self." The following exchange took place immediately thereafter:

Q. [DEFENSE COUNSEL] Well, you remember working as a topless dancer in the past, haven't you?

[STATE]: Your Honor—

A. [ABREO] No. I have never worked as a topless dancer.

BY [DEFENSE COUNSEL]:

Q. Never?

A. Never.

Q. You're sure of that?

A. As far as I know, I've never been a topless dancer. I've always had too big of a body to do dancing in front of any men. I'm sorry.

Outside the jury's presence, Appellant's counsel questioned Abreo about testifying in another court, when she pled guilty to the offense of criminal trespass. Abreo persistently replied that she did not remember testifying on that occasion. Abreo finally stated that she had been in a serious car accident, and that while she "vaguely remember[ed] getting in trouble for a criminal trespass," she could not remember everything. When asked if she had sustained a brain injury, Abreo said that she did not recall it being a brain injury.

Before the jury, however, Abreo admitted that she had, in fact, testified previously. When asked if she had ever been inside Appellant's house, Abreo laughed, stating that she "wouldn't go in that house" because "it's a hazard to anybody's health." Abreo testified that she could not remember the police asking her to go to the station to give a statement, and that

she did not remember talking to the police after she gave her statement. Additionally, Abreo claimed that she did not remember whether she gave a statement the same day she went to the police station.

Abreo eventually conceded that the car wreck, which she thought had occurred in 1992 or 1993, had affected her memory and her ability to correctly recall things. The record also reflects that Abreo laughed inappropriately on at least one other occasion during her testimony.

During his case-in-chief, Appellant called three witnesses who testified that Abreo was not worthy of belief. Appellant also attempted to ask two of the witnesses about having seen Abreo dance topless at a club, but the trial judge sustained the State's objections and excluded the evidence.

Appellant describes as "fantastic" Abreo's assertion that he reacted to her refusal to take his wife to the hospital by telling her that he intended to "take out his kids ... and make it look like an accident."

 The general rule is that a party is not entitled to impeach a witness on a collateral matter.[15] A well-recognized exception exists when a witness "testifies gratuitously as to some matter that is irrelevant or collateral to the proceeding."[16] In that instance, the witness may be impeached by evidence contradicting her testimony, the inference being that if the witness lied about a collateral matter, then it is also likely that she has not been truthful about other matters more pertinent to the case.[17]

---

15. *Ramirez v. State*, 802 S.W.2d 674, 675 (Tex.Crim.App.1990); *Bates v. State*, 587 S.W.2d 121, 133 (Tex.Crim.App.1979); *Norrid v. State*, 925 S.W.2d 342, 347 (Tex.App.—Fort Worth 1996, no pet.).

16. *Hammett v. State*, 713 S.W.2d 102, 105 (Tex.Crim.App.1986).

17. *Cantu v. State*, 939 S.W.2d 627, 635 (Tex. Crim.App.), *cert. denied*, 522 U.S. 994, 118 S.Ct. 557, 139 L.Ed.2d 399 (1997) (holding Texas Rule of Criminal Evidence 610(b), per-

■ An effective cross-examination encompasses more than just the opportunity to elicit testimony to establish the existence of certain facts. The cross-examiner should be allowed to expose the limits of the witness' knowledge of relevant facts, place the witness in her proper setting, and test the credibility of the witness.[18] The standard for reviewing the trial court's decision to limit cross-examination of a witness regarding credibility is whether the trial court abused its discretion.[19]

Although the trial court upheld the State's objections to the testimony of the two witnesses who claimed to have seen Abreo dance topless at a club in 1989, the State had made no objection and obtained no ruling when Abreo was asked on cross-examination about such employment. Additionally, the State first raised the issue of employment by questioning Abreo on direct examination as to her current employment and establishing that she was employed at the time of her encounter with Appellant. The State then acquiesced when Abreo created the false impression concerning whether she had worked as a topless dancer in the past. Accordingly, the trial court erred in refusing to allow Appellant to correct the false impression Abreo created and should have

allowed Appellant to impeach her direct denial of employment as a topless dancer.

■ Having found error, we must conduct a harm analysis to determine whether the error calls for reversal of the judgment.[20] If the error is constitutional, we apply rule 44.2(a) and reverse unless we determine beyond a reasonable doubt that the error did not contribute to Appellant's conviction or punishment.[21] Otherwise, we apply rule 44.2(b) and disregard the error if it does not affect Appellant's substantial rights.[22]

■ The Sixth Amendment to the United States Constitution guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him.[23] The right of confrontation encompasses more than the opportunity to physically confront the witnesses.[24] A primary interest secured by the Confrontation Clause is the right of cross-examination.[25] The right to cross-examine a testifying State's witness extends to any matter that could reflect on the witness's credibility.[26] The right of an accused to cross-examine a testifying State's witness includes the right to impeach the witness with relevant evidence that might reflect bias, interest, prejudice, inconsistent statements, traits of character affecting credibility, or evidence that might go to

mitting cross-examination on any matter relevant to credibility, allows for impeachment on a collateral matter when relevant to a witness' credibility by contradicting witness' testimony); *Hammett*, 713 S.W.2d at 105.

**18.** *Spain v. State*, 585 S.W.2d 705, 710 (Tex. Crim.App.1979).

**19.** *Cantu*, 939 S.W.2d at 635.

**20.** Tex.R.App. P. 44.2.

**21.** *Id.* 44.2(a).

**22.** *Id.* 44.2(b); *see Mosley v. State*, 983 S.W.2d 249, 259 (Tex.Crim.App.1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070, 119 S.Ct. 1466,

143 L.Ed.2d 550 (1999); *Coggeshall v. State*, 961 S.W.2d 639, 642–43 (Tex.App.—Fort Worth 1998, pet. ref'd) (en banc).

**23.** U.S. Const. amend. VI; *Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974).

**24.** *Davis*, 415 U.S. at 315, 94 S.Ct. at 1110.

**25.** *Id.*

**26.** *Virts v. State*, 739 S.W.2d 25, 28–29 (Tex. Crim.App.1987).

any impairment or disability affecting the witness' credibility.[27]

Here, although the excluded evidence was not offered during Appellant's cross-examination of Abreo, but rather, during Appellant's case-in-chief through the testimony of defense witnesses, the evidence was offered for the purpose of impeaching Abreo's credibility by contradicting her earlier statement made during cross-examination that she had never worked as a topless dancer. As Appellant argued before the trial court:

> [W]here we have a direct lie to the jury, they need to know that, because she is the State's key witness. She cannot be believed under oath and she is not a person that the jury should believe and they need to know of the specific time that she lied to them directly before this jury.

Accordingly, we hold that the trial court's improper exclusion of the testimony in this case was akin to a denial of effective cross-examination, as guaranteed by the Confrontation Clause.[28] As such, the error was constitutional in nature, and we must apply rule 44.2(a) to determine whether the error warrants a reversal of the trial court's judgment.

■ The pertinent question in evaluating constitutional error is whether the trial court's failure to allow Appellant to introduce evidence impeaching the credibility of a witness for the State was harmless beyond a reasonable doubt.[29] In applying the "harmless error" test, our primary question is what effect the error had, or reasonably may have had on the jury's decision.[30]

■ Our harmless error analysis must focus upon the error rather than the propriety of the outcome of the trial, trace its probable impact upon the jury, and determine whether it contributed to the conviction or punishment.[31] Our review concentrates on the fairness of the trial and the integrity of the process.[32] We consider the source and nature of the error, the extent that it was emphasized by the State, its probable collateral implications, the weight a juror would probably place on the error, and whether declaring it harmless would be likely to encourage the State to repeat it with impunity.[33] This requires us to evaluate the entire record in a neutral, impartial, and even-handed manner, not in the light most favorable to the prosecution.[34]

■ Where evidence is excluded as a result of an erroneous limitation on cross-examination, a reviewing court must first assume that the damaging potential of the desired cross-examination was fully realized.[35] In other words, we must assume that the jury was fully informed of the evidence contradicting Abreo's denial of

27. *Id.* at 29; *Alexander v. State,* 949 S.W.2d 772, 774 (Tex.App.—Dallas 1997, pet. ref'd).

28. *See L.M.W. v. State,* 891 S.W.2d 754, 766 (Tex.App.—Fort Worth 1994, pet. ref'd).

29. *See Williams v. State,* 958 S.W.2d 186, 194 (Tex.Crim.App.1997).

30. *Mosley,* 983 S.W.2d at 259 (stating that constitutional errors should be analyzed in the same manner as under former rule 81(b)(2)).

31. *Harris v. State,* 790 S.W.2d 568, 585–87 (Tex.Crim.App.1989).

32. *Id.*

33. *Id.* at 587.

34. *Id.* at 586.

35. *Shelby v. State,* 819 S.W.2d 544, 550 (Tex.Crim.App.1991) (citing *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986)).

having ever worked as a topless dancer. Next, we apply the following five factors: (1) the importance of Abreo's testimony in the State's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of cross-examination otherwise permitted; and (5) the overall strength of the State's case.[36]

In his brief, Appellant argues that "Ms. Abreo was the State's key witness. In fact she was the only witness with anything to say bad about the Appellant." While Appellant is correct that Abreo was an important witness for the State, it is not true that she was the only witness with something bad to say about Appellant. A great majority of the State's witnesses, in fact, said something "bad" about Appellant, whether directly or by implication. While Abreo's testimony was the only evidence that Appellant *intentionally* caused Joseph's death, the record shows that the State waived the portion of the indictment charging Appellant with "intentional" injury to a child, and proceeded to prosecute him on the lesser culpable mental state of "knowing."

Appellant also contends that "[t]he destruction of [Abreo's] credibility in this way removed any conceivable evidence which even suggested that this death was anything other than a tragic accident." As we previously stated, however, the record contains sufficient evidence, entirely apart from Abreo's testimony, that Appellant knew of the dangers of leaving the septic tank uncovered, and that he knew that his failure to cover the tank was reasonably certain to cause serious bodily injury to Joseph.

Appellant states that Abreo's credibility was left "virtually unscathed due to the trial court's refusal of the impeachment." Although Appellant was not allowed to refute Abreo's testimony directly on the issue of topless dancing, he did challenge her credibility with the testimony of three witnesses that she was not worthy of belief. Appellant also cross-examined Abreo vigorously, causing her to admit to significant lapses in memory and to contradict portions of her testimony on direct examination.

After carefully reviewing the record and performing the appropriate harm analysis under rule 44.2(a) and the *Shelby* case, we hold beyond a reasonable doubt that the trial court's error did not contribute to Appellant's conviction or punishment. Consequently, we overrule Appellant's sixth point.

## EXTRANEOUS ACTS EVIDENCE

In his seventh through twelfth points, Appellant argues that the trial court erred in admitting evidence on a number of extraneous matters. Point seven complains of evidence showing that the house was dirty. Point eight refers to testimony about Joseph wandering in the street unsupervised. Point nine relates to testimony implying that Appellant was drunk when Joseph fell into the septic tank. Point ten complains of testimony that Joseph was terrified of Appellant. Point eleven refers to the testimony of Alma Abreo that Appellant told her that he was sick of his children and wanted to kill them and make it look like an accident. Point twelve pertains to evidence that there were animal feces on the floor of the house, through which Joseph was permitted to crawl.

Appellant contends that these extraneous matters where inadmissible under Rules 401, 403, and 404 of the Texas

36. *Id.* at 550–51.

Rules of Evidence.[37] Because we hold that the evidence was properly admitted under article 38.37 of the Texas Code of Criminal Procedure, we overrule Appellant's seventh, eighth, ninth, tenth, eleventh, and twelfth points.[38]

## DISCUSSION

Rule 401 of the rules of evidence defines "relevant evidence" as follows: "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[39] Rule 403 limits the admissibility of relevant evidence by providing that even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.[40] Rule 404(b) restricts the admissibility of evidence of other crimes, wrongs, or acts, stating that such evidence is not admissible to prove the character of a person in order to show action in conformity therewith.[41]

Article 38.37 of the Texas Code of Criminal Procedure, however, expands the admissibility of extraneous-acts evidence in trials involving certain offenses committed against a child under seventeen years of age.[42] That article provides, in relevant part:

> Notwithstanding Rules 404 and 405, Texas Rules of Evidence, evidence of other crimes, wrongs, or acts committed by the defendant against the child who is the victim of the alleged offense shall be admitted for its bearing on relevant matters, including:

> (1) the state of mind of the defendant and the child; and

> (2) the previous and subsequent relationship between the defendant and the child.[43]

Appellant was prosecuted under section 22.04 of the Texas Penal Code for injury to a child, an offense to which article 38.37 applies.[44] Nevertheless, Appellant argues that the above evidence was inadmissible because it did not constitute crimes, wrongs, or acts committed against the child. As Appellant states in his brief: "The fact that the Appellant was careless does not amount to an action against the child." We disagree with Appellant's characterization of the evidence.

Appellant was charged with knowingly causing serious bodily injury to a child by omission, by failing to cover a septic tank containing liquid. Accordingly, evidence regarding Appellant's failure to care for Joseph in the past was admissible under article 38.37 for its bearing on relevant matters, in particular, as it shed light on the previous relationship between Appellant and Joseph.[45] That Joseph lived in a filthy house and crawled through animal feces left on the floors, as evidenced by the photographs and witness testimony was, therefore, properly admitted under article 38.37. Also properly admitted under article 38.37 was evidence that Joseph was afraid of Appellant, as it went directly to the relationship between Appellant and Joseph.

Similarly, Officer Waters' testimony regarding Joseph's wandering unsupervised

---

37. Tex.R. Evid. 401, 403, 404.

38. Tex.Code Crim. Proc. Ann. art. 38.37 (Vernon Supp.2001).

39. Tex.R. Evid. 401.

40. *Id.* 403.

41. *Id.* 404(b).

42. Tex.Code Crim. Proc. Ann. art. 38.37.

43. *Id.* § 2.

44. *Id.* § 1.

45. *Id.* § 2(2).

in the street was admissible under article 38.37, not only to demonstrate Appellant's relationship with his child, but also to show that Appellant knew that Joseph was able to leave the house on his own, and knew that his efforts to keep the child inside the house had failed.

Alma Abreo's testimony concerning her encounter with Appellant was also properly admitted under article 38.37 for its bearing on Appellant's state of mind, as well as its tendency to rebut Appellant's defensive theory of accident. Indeed, such evidence was admissible under rule 404(b) of the Texas Rules of Evidence to show intent, plan, and absence of accident.[46]

Because we hold that the foregoing evidence was properly admitted under article 38.37, we overrule Appellant's seventh, eighth, tenth, eleventh, and twelfth points on appeal.

As to Appellant's complaint, in his ninth point, that the trial court erred in admitting evidence implying that he was drunk on the day that Joseph fell into the septic tank, there was, in fact, no such testimony elicited by the State. Although the State certainly attempted to imply intoxication by asking Braudway whether Appellant had been drinking alcohol that day and whether Braudway could smell alcohol on Appellant's breath, Braudway actually responded that he could not remember, and he could not tell, respectively. Appellant does not argue that the State had no good faith basis for asking such questions; therefore, we do not address that issue. Accordingly, we overrule Appellant's ninth point.

## JURY CHARGE

█ Finally, we address Appellant's fifth point, in which he argues that the trial court committed reversible error in denying his requested jury instruction on criminally negligent injury to a child by omission, which, according to Appellant, is a lesser included offense of knowingly causing serious bodily injury to child by omission. Because Appellant's requested instruction does not refer to an offense under our Penal Code, however, we overrule Appellant's fifth point.

## DISCUSSION

Under section 22.04 of the Texas Penal Code, a person commits an offense if he intentionally, knowingly, recklessly, or with criminal negligence, by an act, causes serious bodily injury to a child.[47] If the offense involves an omission, rather than an act, however, a person commits an offense only if he intentionally, knowingly, or recklessly causes serious bodily injury to a child.[48] An individual who, with criminal negligence, causes serious bodily injury to a child by omission, therefore, commits no offense.

Accordingly, since criminally negligent injury to a child by omission is not a criminal offense under our law, Appellant was not entitled to his requested charge as a lesser included offense. Because the trial court did not err in refusing Appellant's requested instruction, we overrule Appellant's fifth point.

## CONCLUSION

Having overruled Appellant's twelve points on appeal, we affirm the trial court's judgment.

DAY, J. concurs without opinion.

46. Tex.R. Evid. 404(b); *see Tate v. State,* 981 S.W.2d 189, 193 (Tex.Crim.App.1998).

47. Tex. Penal Code Ann. § 22.04(a).

48. *Id.*