02-10-248-CR












 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-10-00248-CR

 

 


 
 
 Pavielle
 Monique Simpson
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 STATE
 
 


 

 

------------

 

FROM Criminal
District Court No. 4
OF Tarrant COUNTY

------------

MEMORANDUM
OPINION[1]

----------

         
A jury found appellant Pavielle Simpson guilty of
knowingly causing serious bodily injury to her son, J.F. 
Simpson challenges the sufficiency of the evidence and complains of an error in
the indictment.  We will affirm the trial court’s judgment.

Background
Facts

         
Simpson and her boyfriend, Jason Farrington, were living in an apartment with
their son J.F. and another couple, Marcus Simpson and
Shayla Latham.  On March 26, 2009, one-month-old
J.F. was admitted to Cook Children’s Hospital with
“orbital eye swelling and a skull fracture.”  Donna Wright, a nurse at the
hospital, said the fractures were on both sides of his head and described them
as “significant” and the result of “tremendous force.”  Wright identified
two separate points of impact necessary to explain the stellate
fractures on each side of J.F.’s head.  Simpson
believed the injuries were caused by the vacuum extractor used during his birth
and claimed she knew of no trauma that he might have suffered.  Doctors at
the hospital believed the injuries were not consistent
with a vacuum extraction but were the result of intentional abuse.  Child
Protective Services (CPS) was notified, and an investigator, Sky Gaeta, arrived
at the hospital to take custody of J.F.

Both
Gaeta and Wright told Simpson that J.F. had been
abused, but Simpson insisted the injuries were from the vacuum
extraction.  Gaeta also informed Simpson that CPS was removing J.F. from her custody and was creating a safety plan that
Simpson would have to agree to follow in order to have her son returned to
her.  Simpson appeared concerned about J.F.’s
injuries and interested in his return.

Detective
Savage of the Crimes Against Children unit of the
Arlington Police Department interviewed Simpson at her apartment the next
day.  Simpson reiterated her belief that the injuries were from the vacuum
extraction.  Detective Savage told her that they were not from birth, that
they were intentional, and that he believed Farrington had caused them. 
Simpson told Detective Savage that she would do anything to get J.F. back, even if it meant leaving Farrington, and that
she could move to Waco to live with her aunt.

         
The CPS safety plan required Simpson to agree that J.F.
“will not have contact (physical, verbal, written or other)” with Farrington,
Marcus Simpson, or Latham “until notified otherwise.”  Arlington police
could not determine which of the three had abused J.F.,
so Simpson was told that none of them, including Farrington, could be around J.F.  Simpson moved out of the apartment and moved in
with Tanesha Benjamin and Benjamin’s boyfriend. 
Simpson told Benjamin that the doctors did not know how J.F.
received his injuries and that she thought that they happened at his
birth.  Both Simpson and Benjamin signed the safety plan.

         
 The night after J.F. was returned to Simpson,
Farrington went to Benjamin’s apartment.  He went to the apartment again
the next day and “never left.”  Farrington lived with Simpson and J.F. in the apartment for the next three months. 
Simpson told Benjamin that she loved Farrington and could not take care of J.F. without his help.  Farrington would watch J.F. when Simpson was at work, and Simpson never seemed
hesitant to leave J.F. with Farrington.

Gaeta,
the CPS investigator, called Simpson on April 9, 2009, to get contact
information for Farrington.  Simpson told Gaeta that Farrington had moved
to New Jersey.  Simpson also refused to provide Farrington’s correct
contact information to Detective Savage, who felt she was hampering the
investigation.

         
Also on April 9, Simpson took J.F. for a follow-up
visit at the hospital.  X-rays and CT scans revealed that J.F.’s ribs had also been fractured back in March. 
When Wright, the nurse who had attended to J.F.,
showed Simpson the x-rays and scans, Simpson exclaimed, “He could have killed
my baby.”  Wright felt that Simpson adequately understood the danger the
child would be in if he were further exposed to the individual who inflicted
the previous injuries.

         
In May 2009, Gaeta had to close her investigation (which was legally only
allowed to continue for sixty days) and transferred the case to Family Based
Safety Services (FBSS), which assigned it to John
Whitfield.  Whitfield called Simpson five or six times before she returned
his phone call.  She told Whitfield that she did not know where Farrington
was, but she believed he had moved in with his mother.  FBSS gave Simpson a new safety plan, which also included
the condition that J.F. have no contact with
Farrington until Farrington had completed services and had met with CPS.[2]  Whitfield visited Simpson again on
May 19, 2009, and Simpson claimed again not to have any contact information for
Farrington.  While Whitfield was at the apartment, Farrington was hiding
in the back bedroom.

         
On June 24, 2009, Benjamin and Simpson were at work and Farrington was alone in
the apartment with J.F.  Farrington called
Simpson at work because J.F. was not breathing. 
On the way to the apartment, Simpson called 911.  After speaking to the
911 operator, Simpson told Farrington over the phone that he had to hide
because he was “not even supposed to be around [J.F.].” 
Farrington left the apartment before medical services arrived, and Simpson and
Benjamin agreed that Benjamin would tell the police that she was watching J.F. that morning.

         
At the hospital, doctors attempted to perform a CAT scan of J.F.’s
head, but he went into arrest.  The PICU doctor
testified that his abdomen was filling with blood as the result of a
“catastrophic injury” to his stomach.  Because J.F.
kept arresting, they could not operate.  The doctor told Simpson that J.F. was not going to survive, and Simpson immediately made
a phone call, screaming into the phone, “You killed him, you killed my
baby.”  The doctor tried to explain all of J.F.’s
injuries to Simpson, but Simpson would not engage in the conversation, texting
and “messing with her phone” instead.  Simpson later asked the doctor if
she could get Farrington to admit what he did, whether that would “make things
better for him.”

CPS
investigator Gaeta was notified and she went to the hospital.  Simpson
told her that “she knew that [Farrington] had caused the injuries, but that he
didn’t mean to and he was sorry.  And that he shouldn’t
go to jail because he was sick and he just needed to get some help.” 
Gaeta noted that Simpson seemed “unconcerned about [J.F.]
and she was just more concerned about [Farrington] and what would happen to him
permanently.”  Simpson admitted that Farrington had moved in with her, but
she claimed it was after the safety plan had expired.  Gaeta reminded
Simpson that Farrington could not move in even after the plan’s
expiration.  Simpson did not respond.  While at the hospital, Simpson
told her mother that Farrington had sworn that “he wouldn’t hurt [J.F.] again.”  Simpson also told her mother at the
hospital that “the only way” she would leave Farrington was “this situation.”

Detective
Hubbard of the Arlington Police Department also arrived at the hospital. 
When he questioned Simpson about her story of the morning’s events, Simpson
admitted that she had lied but now that her baby was dying, she was going to
tell the truth.  Simpson then told Detective Hubbard that Farrington had
moved in, but only after the expiration of the safety plan.  She showed
the detective a copy of the plan and pointed out the expiration date. 
Simpson later handed Detective Hubbard her cell phone so he could speak to
Farrington, who admitted that he had struck J.F. with
his hands on “the leg, the butt, the stomach, and the head.”[3]

Eventually,
the doctor attending to J.F. recommended that he be
taken off life support.  Simpson agreed and then said she wanted to be
with her new boyfriend, who was waiting downstairs.  Simpson left before J.F. died and returned after his death, asking to hold
him.  The PICU doctor testified that of all the
conversations she had with Simpson at the hospital, the only time Simpson
initiated a conversation about J.F. was “the last one
where she said, ‘I’m ready to turn the machines off, he’s suffered enough.’”

The
next day, Detective Hubbard interviewed Simpson again.  He testified that
you “wouldn’t have known” by her demeanor that her child had just died. 
She told Detective Hubbard that she had been praying for a sign from God to
tell her to leave Farrington and that J.F.’s death
was the sign she had been looking for.

Simpson
was charged with knowingly, by omission, causing serious bodily injury to J.F. by failing to protect him from Farrington.  A
jury trial was held, and Simpson was found guilty.  She was sentenced to
thirteen years imprisonment.  This appeal followed.

Standard
of Review

Simpson’s
first four issues challenge the legal and factual sufficiency of the
evidence.  Simpson’s first issue claims that the evidence is factually
insufficient to support the jury’s verdict that she committed first degree
injury to a child.  Factual sufficiency claims are no longer viable in
Texas because the court of criminal appeals has held that the legal sufficiency
standard articulated in Jackson v. Virginia, 443 U.S. 307, 319, 99 S.
Ct. 2781, 2789 (1979), is the only standard that a reviewing court should apply
in determining whether the evidence is sufficient to support each element of a
criminal offense that the State is required to prove beyond a reasonable
doubt.  See Brooks v. State, 323 S.W.3d
893, 912 (Tex. Crim. App. 2010) (overruling Clewis
v. State, 922 S.W.2d 126 (Tex. Crim. App.
1996)).  Accordingly, we overrule Simpson’s first issue.

In
her second issue, Simpson contends that the evidence is legally insufficient to
prove that she knew if she left her child with Farrington that it was
reasonably certain that serious bodily injury to the child would result. 
In our due-process review of the sufficiency of the evidence to support a
conviction, we view all of the evidence in the light most favorable to the
prosecution to determine whether any rational trier
of fact could have found the essential elements of the crime beyond a
reasonable doubt.  Jackson, 443 U.S. at 319, 99
S. Ct. at 2789; Clayton v. State, 235 S.W.3d
772, 778 (Tex. Crim. App. 2007).

Discussion

Simpson
contends that the evidence is legally insufficient to sustain the jury’s
verdict that she knowingly, by her omission, caused serious bodily injury to J.F. by failing to protect him from Farrington.  See
Tex. Penal Code Ann. § 22.04 (West 2011).  Injury to a child is a
“result of conduct” offense.  Johnston v. State,
150 S.W.3d 630, 634 (Tex. App.—Austin 2004, no pet.).
 This means that the culpable mental state relates not to the nature or
circumstances surrounding the charged conduct, but to the result of that
conduct.  Patterson v. State, 46 S.W.3d 294, 301 (Tex. App.—Fort Worth 2001, no pet.).
 A person acts knowingly when she is aware that her conduct is reasonably
certain to cause the result.  Tex. Penal Code Ann. §
6.03(c) (West 2011).

The
jury could have reasonably concluded that Simpson knew that by allowing
Farrington access to J.F., it was reasonably certain
that J.F. would be seriously injured.  Simpson
knew that Farrington had caused J.F.’s injuries in
March.  She knew that those injuries were intentional and
life-threatening.  J.F.’s injuries were the
result of more than a fall; they were the result of extreme force, akin to “slap[ping] a baby against the wall.”  Simpson knew that
if she had protected J.F. from Farrington, J.F.’s injuries would have been prevented.  See
Payton v. State, 106 S.W.3d 326, 331 (Tex.
App.—Fort Worth 2003, pet. ref’d) (holding that a
grandfather knowingly failed to protect his grandson (of whom he had custody)
from the child’s father when grandfather “knew [the father] was very cruel and
hurting the children”).  The present case is quite different from Dusek v. State, 978 S.W.2d
129 (Tex. App.—Austin 1998, pet. ref’d).  See
Payton, 106 S.W.3d at 332 (acknowledging that the
Dusek court relied on a lack of prior serious
injury in holding that appellant did not act knowingly).  In Dusek, the appellant’s boyfriend had beaten the
victim before, but never so as to create a serious threat to the child’s
health.  978 S.W.2d at
134.  The appellate court held that the evidence was insufficient
to support a finding that the appellant knew her boyfriend was reasonably
certain to inflict serious bodily injury to her child.  Id. 
Here, Simpson knew that Farrington was capable of inflicting serious bodily
injury to J.F. because he had done it before, only a
few months previously.

This
case is also unlike Patterson, which Simpson relies upon in her
brief.  In Patterson, the appellant’s ex-boyfriend broke into the
appellant’s house, kidnapped the appellant’s children, and then killed one
child and seriously injured the other.  46 SW3d at 300.  The appellant heard the
kidnapping, but waited until the morning to call 911.  Id.
at 301.  This court held there was insufficient evidence to prove
that the appellant knew that if she attempted to stop the kidnapping, she would
have succeeded in preventing injury to her children.  Id.
at 303.

Here,
Simpson could have been reasonably certain that if she had prevented contact
with Farrington as she had been told, Farrington could not have injured J.F.  Stated differently, but for Simpson’s omission
to protect her child from Farrington, J.F. would not
have been injured by Farrington and would not have died.  Simpson knew
that Farrington was not allowed to have any contact with J.F.,
and she was warned about such prohibited contact by at least two CPS workers
and one police officer.  See Rankin v. State, 41 S.W.3d 335, 339–42 (Tex. App.—Fort Worth 2001, pet. ref’d) (holding that appellant knowingly, by omission, caused
serious injury to a child when he failed to keep a cover on his septic tank,
after he had been warned repeatedly that the tank was dangerous).  Simpson
violated that condition immediately, first by allowing Farrington into the
apartment the same night J.F. was released from the
hospital and then by allowing him to move in just days later.  Even after
seeing the x-rays of J.F.’s skull fractures, she
continued to allow Farrington to watch J.F.
alone.  Simpson admitted upon viewing the x-rays that Farrington could
have killed J.F. by inflicting the previous
injuries.  By this admission to the nurse practitioner, we do not have to
speculate about Simpson’s mental state.  See Couchman
v. State, 3 S.W.3d 155, 163–64 (Tex. App.—Fort
Worth 1999, pet. ref’d) (noting that proof of a
culpable mental state generally relies upon circumstantial evidence, such as
the suspicious conduct or statements of the actor).  Based on the
evidence, a rational jury could have concluded beyond a reasonable doubt that
Simpson failed to protect her child from Farrington, knowing to a reasonable
certainty that Farrington would inflict serious bodily injury to him.

Benjamin
testified that if she had known that Farrington had intentionally caused J.F.’s injuries, he would not have been allowed in the
apartment.  Simpson’s failure to keep Farrington away
from J.F. and her lies to her roommates about the
source of J.F.’s injuries were the only ways
Farrington had access to J.F.  Although
Farrington told Simpson it would not happen again, neither Simpson nor
Farrington had undertaken any of the services offered by FBSS
and there was no evidence that Farrington or Simpson had made any other changes
to their lifestyle that could help prevent harm to J.F.

Simpson
lied repeatedly to CPS and the Arlington police about Farrington’s whereabouts,
even as J.F. lay dying in the hospital.  She
also lied to Benjamin about the source of J.F.’s
injuries.  A jury may infer from a person’s lying that “he had something
to hide.”  Couchman, 3 S.W.3d at 164.  It would not be unreasonable
for the jury to have concluded that Simpson lied about Farrington’s whereabouts
to protect him and so that he may have continued,
unfettered access to J.F.  We therefore hold
that the evidence is sufficient to support the jury’s verdict that Simpson
knowingly, by her omission, caused serious bodily injury to J.F.
by failing to protect him from Farrington.  We overrule Simpson’s second
issue.  Because we affirm the trial court’s judgment that Simpson acted
knowingly, we do not reach Simpson’s third and fourth issues.  See
Tex R. App. P. 47.1.

In
her fifth issue, Simpson argues that the indictment is fundamentally defective
because it alleges that J.F. was “a child younger
than 15 years of age” instead of tracking the statutory language which defines
a child as “a person 14 years of age or younger.”  See Tex. Penal
Code Ann. § 22.04(c)(1).  The record reflects
that Simpson did not raise this issue before trial.  Therefore, she has
not preserved the issue for our review.  See Studer
v. State, 799 S.W.2d 263, 271 (Tex. Crim. App.
1990); see also Tex. Code Crim. Proc. Ann. art. 1.14(b)
(West 2005); Tex. R. App. P. 33.1(a).  We therefore overrule
Simpson’s fifth issue.

Conclusion

         
Having overruled all of Simpson’s dispositive issues, we affirm the judgment of
the trial court. 

 

 

LEE
GABRIEL

                                                JUSTICE

 

PANEL: 
WALKER, McCOY, and GABRIEL, JJ.

 

DO
NOT PUBLISH

Tex.
R. App. P. 47.2(b)

 

DELIVERED:  June 2,
2011














[1]See
Tex. R. App. P. 47.4.





[2]FBSS safety plans do not expire and are renewed every
ninety days.





[3]Farrington
was later arrested and pleaded guilty to injury to a child.  He is
currently serving a life sentence.