

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-10-00248-CR

PAVIELLE MONIQUE SIMPSON                                                      APPELLANT

V.

THE STATE OF TEXAS                                                                   STATE

------------

## FROM CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

----------

A jury found appellant Pavielle Simpson guilty of knowingly causing serious bodily injury to her son, J.F. Simpson challenges the sufficiency of the evidence and complains of an error in the indictment. We will affirm the trial court's judgment.

---

[1]*See* Tex. R. App. P. 47.4.

**Background Facts**

Simpson and her boyfriend, Jason Farrington, were living in an apartment with their son J.F. and another couple, Marcus Simpson and Shayla Latham. On March 26, 2009, one-month-old J.F. was admitted to Cook Children's Hospital with "orbital eye swelling and a skull fracture." Donna Wright, a nurse at the hospital, said the fractures were on both sides of his head and described them as "significant" and the result of "tremendous force." Wright identified two separate points of impact necessary to explain the stellate fractures on each side of J.F.'s head. Simpson believed the injuries were caused by the vacuum extractor used during his birth and claimed she knew of no trauma that he might have suffered. Doctors at the hospital believed the injuries were not consistent with a vacuum extraction but were the result of intentional abuse. Child Protective Services (CPS) was notified, and an investigator, Sky Gaeta, arrived at the hospital to take custody of J.F.

Both Gaeta and Wright told Simpson that J.F. had been abused, but Simpson insisted the injuries were from the vacuum extraction. Gaeta also informed Simpson that CPS was removing J.F. from her custody and was creating a safety plan that Simpson would have to agree to follow in order to have her son returned to her. Simpson appeared concerned about J.F.'s injuries and interested in his return.

Detective Savage of the Crimes Against Children unit of the Arlington Police Department interviewed Simpson at her apartment the next day. Simpson

2

reiterated her belief that the injuries were from the vacuum extraction. Detective Savage told her that they were not from birth, that they were intentional, and that he believed Farrington had caused them. Simpson told Detective Savage that she would do anything to get J.F. back, even if it meant leaving Farrington, and that she could move to Waco to live with her aunt.

The CPS safety plan required Simpson to agree that J.F. "will not have contact (physical, verbal, written or other)" with Farrington, Marcus Simpson, or Latham "until notified otherwise." Arlington police could not determine which of the three had abused J.F., so Simpson was told that none of them, including Farrington, could be around J.F. Simpson moved out of the apartment and moved in with Tanesha Benjamin and Benjamin's boyfriend. Simpson told Benjamin that the doctors did not know how J.F. received his injuries and that she thought that they happened at his birth. Both Simpson and Benjamin signed the safety plan.

The night after J.F. was returned to Simpson, Farrington went to Benjamin's apartment. He went to the apartment again the next day and "never left." Farrington lived with Simpson and J.F. in the apartment for the next three months. Simpson told Benjamin that she loved Farrington and could not take care of J.F. without his help. Farrington would watch J.F. when Simpson was at work, and Simpson never seemed hesitant to leave J.F. with Farrington.

Gaeta, the CPS investigator, called Simpson on April 9, 2009, to get contact information for Farrington. Simpson told Gaeta that Farrington had

moved to New Jersey. Simpson also refused to provide Farrington's correct contact information to Detective Savage, who felt she was hampering the investigation.

Also on April 9, Simpson took J.F. for a follow-up visit at the hospital. X-rays and CT scans revealed that J.F.'s ribs had also been fractured back in March. When Wright, the nurse who had attended to J.F., showed Simpson the x-rays and scans, Simpson exclaimed, "He could have killed my baby." Wright felt that Simpson adequately understood the danger the child would be in if he were further exposed to the individual who inflicted the previous injuries.

In May 2009, Gaeta had to close her investigation (which was legally only allowed to continue for sixty days) and transferred the case to Family Based Safety Services (FBSS), which assigned it to John Whitfield. Whitfield called Simpson five or six times before she returned his phone call. She told Whitfield that she did not know where Farrington was, but she believed he had moved in with his mother. FBSS gave Simpson a new safety plan, which also included the condition that J.F. have no contact with Farrington until Farrington had completed services and had met with CPS.[2] Whitfield visited Simpson again on May 19, 2009, and Simpson claimed again not to have any contact information for Farrington. While Whitfield was at the apartment, Farrington was hiding in the back bedroom.

---

[2]FBSS safety plans do not expire and are renewed every ninety days.

4

On June 24, 2009, Benjamin and Simpson were at work and Farrington was alone in the apartment with J.F. Farrington called Simpson at work because J.F. was not breathing. On the way to the apartment, Simpson called 911. After speaking to the 911 operator, Simpson told Farrington over the phone that he had to hide because he was "not even supposed to be around [J.F.]." Farrington left the apartment before medical services arrived, and Simpson and Benjamin agreed that Benjamin would tell the police that she was watching J.F. that morning.

At the hospital, doctors attempted to perform a CAT scan of J.F.'s head, but he went into arrest. The PICU doctor testified that his abdomen was filling with blood as the result of a "catastrophic injury" to his stomach. Because J.F. kept arresting, they could not operate. The doctor told Simpson that J.F. was not going to survive, and Simpson immediately made a phone call, screaming into the phone, "You killed him, you killed my baby." The doctor tried to explain all of J.F.'s injuries to Simpson, but Simpson would not engage in the conversation, texting and "messing with her phone" instead. Simpson later asked the doctor if she could get Farrington to admit what he did, whether that would "make things better for him."

CPS investigator Gaeta was notified and she went to the hospital. Simpson told her that "she knew that [Farrington] had caused the injuries, but that he didn't mean to and he was sorry. And that he shouldn't go to jail because he was sick and he just needed to get some help." Gaeta noted that Simpson

5

seemed "unconcerned about [J.F.] and she was just more concerned about [Farrington] and what would happen to him permanently." Simpson admitted that Farrington had moved in with her, but she claimed it was after the safety plan had expired. Gaeta reminded Simpson that Farrington could not move in even after the plan's expiration. Simpson did not respond. While at the hospital, Simpson told her mother that Farrington had sworn that "he wouldn't hurt [J.F.] again." Simpson also told her mother at the hospital that "the only way" she would leave Farrington was "this situation."

Detective Hubbard of the Arlington Police Department also arrived at the hospital. When he questioned Simpson about her story of the morning's events, Simpson admitted that she had lied but now that her baby was dying, she was going to tell the truth. Simpson then told Detective Hubbard that Farrington had moved in, but only after the expiration of the safety plan. She showed the detective a copy of the plan and pointed out the expiration date. Simpson later handed Detective Hubbard her cell phone so he could speak to Farrington, who admitted that he had struck J.F. with his hands on "the leg, the butt, the stomach, and the head."[3]

Eventually, the doctor attending to J.F. recommended that he be taken off life support. Simpson agreed and then said she wanted to be with her new boyfriend, who was waiting downstairs. Simpson left before J.F. died and

---

[3]Farrington was later arrested and pleaded guilty to injury to a child. He is currently serving a life sentence.

6

returned after his death, asking to hold him. The PICU doctor testified that of all the conversations she had with Simpson at the hospital, the only time Simpson initiated a conversation about J.F. was "the last one where she said, 'I'm ready to turn the machines off, he's suffered enough.'"

The next day, Detective Hubbard interviewed Simpson again. He testified that you "wouldn't have known" by her demeanor that her child had just died. She told Detective Hubbard that she had been praying for a sign from God to tell her to leave Farrington and that J.F.'s death was the sign she had been looking for.

Simpson was charged with knowingly, by omission, causing serious bodily injury to J.F. by failing to protect him from Farrington. A jury trial was held, and Simpson was found guilty. She was sentenced to thirteen years imprisonment. This appeal followed.

## Standard of Review

Simpson's first four issues challenge the legal and factual sufficiency of the evidence. Simpson's first issue claims that the evidence is factually insufficient to support the jury's verdict that she committed first degree injury to a child. Factual sufficiency claims are no longer viable in Texas because the court of criminal appeals has held that the legal sufficiency standard articulated in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979), is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is

7

required to prove beyond a reasonable doubt. *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (overruling *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996)). Accordingly, we overrule Simpson's first issue.

In her second issue, Simpson contends that the evidence is legally insufficient to prove that she knew if she left her child with Farrington that it was reasonably certain that serious bodily injury to the child would result. In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

**Discussion**

Simpson contends that the evidence is legally insufficient to sustain the jury's verdict that she knowingly, by her omission, caused serious bodily injury to J.F. by failing to protect him from Farrington. *See* Tex. Penal Code Ann. § 22.04 (West 2011). Injury to a child is a "result of conduct" offense. *Johnston v. State*, 150 S.W.3d 630, 634 (Tex. App.—Austin 2004, no pet.). This means that the culpable mental state relates not to the nature or circumstances surrounding the charged conduct, but to the result of that conduct. *Patterson v. State*, 46 S.W.3d 294, 301 (Tex. App.—Fort Worth 2001, no pet.). A person acts knowingly when she is aware that her conduct is reasonably certain to cause the result. Tex. Penal Code Ann. § 6.03(c) (West 2011).

8

The jury could have reasonably concluded that Simpson knew that by allowing Farrington access to J.F., it was reasonably certain that J.F. would be seriously injured. Simpson knew that Farrington had caused J.F.'s injuries in March. She knew that those injuries were intentional and life-threatening. J.F.'s injuries were the result of more than a fall; they were the result of extreme force, akin to "slap[ping] a baby against the wall." Simpson knew that if she had protected J.F. from Farrington, J.F.'s injuries would have been prevented. *See Payton v. State*, 106 S.W.3d 326, 331 (Tex. App.—Fort Worth 2003, pet. ref'd) (holding that a grandfather knowingly failed to protect his grandson (of whom he had custody) from the child's father when grandfather "knew [the father] was very cruel and hurting the children"). The present case is quite different from *Dusek v. State*, 978 S.W.2d 129 (Tex. App.—Austin 1998, pet. ref'd). *See Payton*, 106 S.W.3d at 332 (acknowledging that the *Dusek* court relied on a lack of prior serious injury in holding that appellant did not act knowingly). In *Dusek*, the appellant's boyfriend had beaten the victim before, but never so as to create a serious threat to the child's health. 978 S.W.2d at 134. The appellate court held that the evidence was insufficient to support a finding that the appellant knew her boyfriend was reasonably certain to inflict serious bodily injury to her child. *Id*. Here, Simpson knew that Farrington was capable of inflicting serious bodily injury to J.F. because he had done it before, only a few months previously.

This case is also unlike *Patterson*, which Simpson relies upon in her brief. In *Patterson*, the appellant's ex-boyfriend broke into the appellant's house,

kidnapped the appellant's children, and then killed one child and seriously injured the other. 46 SW3d at 300. The appellant heard the kidnapping, but waited until the morning to call 911. *Id*. at 301. This court held there was insufficient evidence to prove that the appellant knew that if she attempted to stop the kidnapping, she would have succeeded in preventing injury to her children. *Id*. at 303.

Here, Simpson could have been reasonably certain that if she had prevented contact with Farrington as she had been told, Farrington could not have injured J.F. Stated differently, but for Simpson's omission to protect her child from Farrington, J.F. would not have been injured by Farrington and would not have died. Simpson knew that Farrington was not allowed to have any contact with J.F., and she was warned about such prohibited contact by at least two CPS workers and one police officer. *See Rankin v. State*, 41 S.W.3d 335, 339–42 (Tex. App.—Fort Worth 2001, pet. ref'd) (holding that appellant knowingly, by omission, caused serious injury to a child when he failed to keep a cover on his septic tank, after he had been warned repeatedly that the tank was dangerous). Simpson violated that condition immediately, first by allowing Farrington into the apartment the same night J.F. was released from the hospital and then by allowing him to move in just days later. Even after seeing the x-rays of J.F.'s skull fractures, she continued to allow Farrington to watch J.F. alone. Simpson admitted upon viewing the x-rays that Farrington could have killed J.F. by inflicting the previous injuries. By this admission to the nurse practitioner, we

10

do not have to speculate about Simpson's mental state. *See Couchman v. State*, 3 S.W.3d 155, 163–64 (Tex. App.—Fort Worth 1999, pet. ref'd) (noting that proof of a culpable mental state generally relies upon circumstantial evidence, such as the suspicious conduct or statements of the actor). Based on the evidence, a rational jury could have concluded beyond a reasonable doubt that Simpson failed to protect her child from Farrington, knowing to a reasonable certainty that Farrington would inflict serious bodily injury to him.

Benjamin testified that if she had known that Farrington had intentionally caused J.F.'s injuries, he would not have been allowed in the apartment. Simpson's failure to keep Farrington away from J.F. and her lies to her roommates about the source of J.F.'s injuries were the only ways Farrington had access to J.F. Although Farrington told Simpson it would not happen again, neither Simpson nor Farrington had undertaken any of the services offered by FBSS and there was no evidence that Farrington or Simpson had made any other changes to their lifestyle that could help prevent harm to J.F.

Simpson lied repeatedly to CPS and the Arlington police about Farrington's whereabouts, even as J.F. lay dying in the hospital. She also lied to Benjamin about the source of J.F.'s injuries. A jury may infer from a person's lying that "he had something to hide." *Couchman*, 3 S.W.3d at 164. It would not be unreasonable for the jury to have concluded that Simpson lied about Farrington's whereabouts to protect him and so that he may have continued, unfettered access to J.F. We therefore hold that the evidence is sufficient to support the

11

jury's verdict that Simpson knowingly, by her omission, caused serious bodily injury to J.F. by failing to protect him from Farrington. We overrule Simpson's second issue. Because we affirm the trial court's judgment that Simpson acted knowingly, we do not reach Simpson's third and fourth issues. *See* Tex R. App. P. 47.1.

In her fifth issue, Simpson argues that the indictment is fundamentally defective because it alleges that J.F. was "a child younger than 15 years of age" instead of tracking the statutory language which defines a child as "a person 14 years of age or younger." *See* Tex. Penal Code Ann. § 22.04(c)(1). The record reflects that Simpson did not raise this issue before trial. Therefore, she has not preserved the issue for our review. *See Studer v. State*, 799 S.W.2d 263, 271 (Tex. Crim. App. 1990); *see also* Tex. Code Crim. Proc. Ann. art. 1.14(b) (West 2005); Tex. R. App. P. 33.1(a). We therefore overrule Simpson's fifth issue.

**Conclusion**

Having overruled all of Simpson's dispositive issues, we affirm the judgment of the trial court.

                                                    LEE GABRIEL
                                                    JUSTICE

PANEL:  WALKER, McCOY, and GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  June 2, 2011

13