**1552-14**

ORIGINAL

RECEIVED IN
COURT OF CRIMINAL APPEALS

FEB 05 2015

Abel Acosta, Clerk

IN THE FIFTH COURT OF APPEALS OF TEXAS

Dallas, Texas

| | |
|---|---|
| TINA MARIE ALBERSON, | Case No: F11-59105, 05-13-0021 |
| vs. | Petitioners Request for PDR Review of Appellate Decision Noted November 2014 |
| The State Of Texas Appellate | |

FILED IN
COURT OF CRIMINAL APPEALS

FEB 06 2015

Abel Acosta, Clerk

## I
### Introduction

On November 6, 2014, this court entered an order denying Tina Marie Alberson TDC #1835471, Appeal F11-59105, 05-13-0021. By Counsel J. Daniel Oliphant petitioner requests a Petition for Discretionary Review.

## II
### Argument

Petitioner incorporates by reference the argument in her response to Respondents answer and her objection to report and recommendations as the ruling of court.

Ground I   Legally insufficient to prove appellant recklessly caused Bodily injury.

Ground II Allowing admission of autopsy photo, which emotionally Swayed the jury.

Ground III Failure to include lesser included charge of Criminal Negligence.

Petitioner asked to be heard on each claim not under exhausting observance of law. Rather, Petitioner need only show that the petition contains an issue.

1. That is debatable among jurist reason.
2. That a court order could resolve in a different manner.
3. That ia adequate to deserve encouragement to proceed further.

pg.1

4. That is not squarley forclosed by statute, rule, or authoritive court decision or it is not lacking any factual basis in the record. Petitioner meets all these standards.


I.   Insufficient evidence to prove charge: the only evidence came from Mr. Michael R. James who changed his testimony three seperate times claiming fear of prosicution. Mr. M. James received twenty years to turns states evidence against petitioner.  Only physical evidence was a series of inconsistant witness statements.  Petitioner was convicted on M. James testimony, not on actual **evidence**. THis would also include circumstantial evidence of actual eye witnesses evidence, Not hearsay nor testimony from a protected co-defendant. Comments, pre-conceived ideas, opinions or speculation of three seperate doctors who could not determine possible dehydraytion at first sight is not evidence.

II.   Allowing autopsy photo of a child to sway an emotional jury:
        This is a blatant ineffective counsel claim with appellate attorney did not address. Where trial core attorney did not object to.

III.   Failure to include lessor included charge of criminal negligence: abuse of discretion, for the judge to disregard adequate instructions to jury holding that the harmless error analysis is appropriate when the judge told the jury it could return a guilty verdict based on either of two theories one of which was illegal, and the jury did not say which theory was used to obtain a guilty verdict is an abuse of discretion.

## MEMORANDUM OF LAW

Smith vs. Robbins 528 US. 259-272  120Sct 746-753, 145 LED 756-757(2000)

US. vs. Gomez-Perez  215 F3d 315-320

Anders vs. California  386 US 738-744  87 SCT 1396-4000, 18 LED 2d 493-498

Salazar vs. State  38 Swd 141(2001)

Vernons Ann. Texas cc Part 37.0712 (b) (1)

Rules of Appellate Proceedure, rule 381 (H)

Sneed 670 SW 2d @ 267

Lewis vs. State  911 SW 2d 1, 7  ( 1995 )

Rojos vs. State  986 SW 2d 241-249 (1998)

Burdine vs. State  719 SW 2d 309 (1986)

Reese vs. State 33 SW 3d 238-241 (2000)


   In Rojas and Santellan the main concern was that the jury maight
attribute certain injuries caused by the autopsy to the appellant.

III.    Conclusion

The court should therefore grant a Discretionary Review on these claims for reasons stated, to all portions of each claim raised.

Dated this _____ 2 _____ day of _February_ 20 15

Respectfully Submitted

_Tina M. Alberson_

Tina M. Alberson

TDC #1835471

Crain-Riverside 5-C-20

1401 State School Rd

Gatesville, Tx 76599

**CERTIFICATE OF SERVICE**

I certify that I sent a copy of Petitioner Request for Discretionary Review and Proposal order by First Class mail to:

        Court of Criminal Appeals

        P.O. Box 12308

        Austin, Texas 78711

*Tina M. Alberson*

Tina M. Alberson

TDC# 1835471

Crain Unit-Riverside

S-C-20

1401 State School Rd

Gatesville, TX 76599

Affirmed and Opinion Filed November 6, 2014



In The

## Court of Appeals
## Fifth District of Texas at Dallas

No. 05-13-00121-CR

TINA MARIE ALBERSON, Appellant
V.
THE STATE OF TEXAS, Appellee

On Appeal from the 363rd Judicial District Court
Dallas County, Texas
Trial Court Cause No. F-1159105-W

# MEMORANDUM OPINION

Before Justices Bridges, Francis, and Myers
Opinion by Justice Francis

A jury convicted Tina Marie Alberson of recklessly causing serious bodily injury to her ten-year-old stepson by failing to provide adequate hydration. After finding one enhancement paragraph true, the jury assessed punishment at eighty-five years in prison and a $10,000 fine. In three issues, appellant challenges the legal sufficiency of the evidence to support her conviction and the trial court's rulings to admit an autopsy photograph and to deny her request for a lesser-included offense. For the reasons set out below, we affirm.

Evidence showed the summer of 2011 was one of the hottest on record in the Dallas area with more than seventy days of 100-plus temperatures. On July 1, ten-year-old Jonathan James and his twin brother, Joseph, went to stay for the month with their father and stepmother,

Michael James and appellant. According to Jonathan's mother, Jonathan did not want to go because he thought he would be in trouble the entire time.

The central air conditioning in the house did not work, and the house was cooled by window units and fans. By all accounts, the house was hot. On the night of July 25, Jonathan was rushed to Charlton Methodist Hospital by ambulance after collapsing at home. According to Dr. David Bryant, a staff emergency medicine physician, Jonathan was unresponsive, had a high body temperature, and initially did not have a pulse. Bryant said there were no signs of external trauma to Jonathan's body and it became apparent Jonathan had probably sustained a heat-related injury. An ultrasound revealed there was no urine in his bladder. A Foley catheter was inserted directly into Jonathan's bladder to "drain off whatever might have been there," but no urine was produced, indicating Jonathan was "markedly dehydrated." Lab testing showed Jonathan's white blood cell count was twice the normal limit, indicating he was in "severe distress." In addition, Jonathan had high levels of creatine, indicating he was in renal failure, and a high level of potassium, or hyperkalemia. Bryant said Jonathan had a "severe electrolyte derangement" and multiple organs were shutting down. His heart stopped several times. Despite efforts to resuscitate and stabilize Jonathan, he was pronounced dead. Dr. Bryant's primary diagnosis was acute cardiopulmonary arrest, followed by hyperkalemia, acute renal failure, and DIC. (He explained that in DIC, every cell in the body begins to bleed out.)

Dr. Jeffrey Barnard, chief medical examiner for Dallas County, performed Jonathan's autopsy and determined he died of dehydration. He observed no significant trauma to the body, internally or externally, and no sign of disease. He did note Jonathan's lips were chapped and swollen, which is seen in dehydration. Elevated levels of sodium and chloride in the vitreous fluids, as well as correlating hospital laboratory results, confirmed Jonathan was dehydrated. Barnard said the dehydration was caused by an absence of water and, because of the creatine

level in Jonathan's body, he did not believe it was an "acute event" that occurred "just on the day that he collapsed." Rather, he said Jonathan became dehydrated over several days, "certainly more than one or two." Some of the signs that would have manifested were thirst, chapped and dried lips, sunken eyes, no tears or urination, and confusion and weakness.

Dr. Matthew Cox is board certified in child abuse pediatrics and was asked by investigators to review Jonathan's medical records and autopsy report. After reviewing those records, he likewise concluded Jonathan had suffered "long-standing dehydration over days." Cox explained the lab results showed high levels of sodium, potassium, and chloride in Jonathan's blood. He said Jonathan's sodium level was the highest he had seen in over 200 patients. He believed this developed "over the course of days" and was "not something that could have happened as quickly." In addition, Jonathan's creatine level was more than five times normal, which he said indicated Jonathan's kidney had been progressively failing over a period of about four days. He also noted records showed no urine in the child's bladder.

Detective Stephen David went to the hospital that night. After speaking with family members, David had James and appellant, as Jonathan's caregivers at the time of his death, write out statements. He also obtained consent to search the house. David arrived at the house at about 4 a.m. and said it was "hot." He noted the central air was not working, and only a window unit in the master bedroom appeared to work. In the kitchen-dining room area, David noticed two Xs, one on the floor and the other on a large window inches away. He later learned that as punishment, appellant made Jonathan stand on the X and look out the window and tell her how many birds landed on a shed in the backyard. Photographs of the interior of the house, and in particular the Xs on the floor and kitchen window, were admitted as evidence at trial.

Detective Kimberly Mayfield, who worked in the child abuse unit, assisted in the investigation. She was present when Joseph was interviewed by a counselor at the Children's

Advocacy Center. She was alerted when Joseph immediately said "people weren't telling the truth about what happened." After the interview, she had appellant and James come in. By then, she knew Jonathan's sodium levels were elevated but did not have a cause of death. She also knew the central air was not working in the house, so heat was a "big concern." She talked to James and appellant separately for several hours. Afterwards, she collected Jonathan's medical records and consulted Dr. Cox. In late August, she received the preliminary results of the autopsy and, based on that, had both appellant and James arrested. After the arrests, she interviewed both again. She acknowledged James's story changed from the first to second interview. Video recordings of both interviews with appellant were admitted into evidence.

Evidence at trial focused on the events in the household for several days prior to Jonathan's death. James, who was also indicted for injury to a child and faced a life sentence, waived his Fifth Amendment right and testified without the benefit of a plea bargain. James and the twins' mother were divorced, and he and appellant had been together for eight years. Her son, B.J., who was about two years older than the twins, lived with them. James had standard visitation with his sons, and the boys came to stay with them during the month of July.

James was blind in one eye and legally blind in the other and was diabetic. That summer, a nurse came to the house each day to treat a diabetic ulcer on his foot. He also needed hip replacement surgery and used crutches and a wheelchair to get around. He was ill and in chronic pain, so he said he stayed in bed most days while appellant took care of the household and the children.

One of the rules of the house was that the boys could drink only one glass of water with their meals. To get another glass, they had to eat their food. If they did not finish their meal, they were not allowed more water until the dishes were cleared from the table. But, he stressed,

-4-

the rule lasted only until dinner was over. Also, the boys were not allowed to eat or drink in their bedroom.

According to James, he was generally in charge of his boys' discipline, but appellant was allowed to put them in time-out or take away their privileges, such as watching television or playing video games. Over the years, the boys had become "too fidgety" during regular time-out, so at a friend's suggestion they had begun having the boys "stand on a tack," meaning they had the boys stand and reach for a tack placed on a wall above their heads. That summer, James said Jonathan had been "getting in trouble" for having food in his room, breaking other people's things, and messing with B.J.'s guitar. Evidence suggested appellant had been denying Jonathan water as punishment when he got into trouble.

Jonathan died on a Monday. On the Saturday before his death, James noticed Jonathan was "more lethargic than usual," but said Jonathan was a bit overweight and not as active as the other two boys. That day, the family went to a birthday party for the boys' grandmother. At the party, Jonathan ate a little cake and drank sodas. At one point, he told James he did not feel well. James said appellant was aware of the conversation. James said they did not leave because Jonathan did not seem "that bad." After the party, he said he talked to appellant about calling the doctor if Jonathan did not start feeling better, and appellant said she would make an appointment on Monday. But on Monday, she told James the doctor had no appointments until later in the week.

On Sunday, Jonathan came into the bedroom while the nurse was changing James's bandage. Jonathan told James he was thirsty, and James handed him one of his water bottles. Appellant, who was also in the room, "made" James take the bottle away, saying it was not a good idea for Jonathan to drink after him since he had been sick. James told Jonathan to get a drink from the kitchen. When Jonathan walked out of the room, appellant followed him. James

did not believe Jonathan had enough time to get a drink and believed appellant followed him to keep him from getting a drink. At that point, James said he realized appellant was not letting Jonathan have water and told her she needed to make sure he had something to drink. That same day, he told Jonathan if he was not allowed to drink, he should go to the bathroom–and shut the door to "prevent more problems" with appellant–and drink from the sink.

After the nurse left, Jonathan stayed in the bedroom with James because appellant, who was bipolar, did not want to "deal" with the child. James explained appellant went through periods where she would have "issues" with one person more than others. For the previous five days, he said Jonathan had been on appellant's "radar" and it was "especially strong" that Sunday. While in the room, Jonathan again said he was not feeling well.

On Monday, James knew Jonathan had been put in "another time-out" by appellant. At about 7:30 p.m., appellant brought James his food. While he was eating, Joseph ran in the bedroom and told him Jonathan had "dumped" a glass of cold water over himself. James thought appellant would "have a fit." Instead, she "came running" into bedroom to assure him everything was "okay" and that Jonathan was "just hot."

After dinner, appellant sent B.J. and Joseph outside to play. After they went out, James saw appellant "baby walking" Jonathan into the bathroom. She was bent over with her arms underneath his arms, and he could not see whether Jonathan's eyes were open or closed. James asked Jonathan if he was okay, and either Jonathan or appellant said "yeah." Appellant turned on the water in the bathroom and kept checking in on Jonathan. Then she came into the bedroom, told James Jonathan's eyes had rolled back into his head, and told him to call 9-1-1. Michael grabbed the phone while rushing to the bathroom. Jonathan was sitting in the bathtub, unconscious, with his shorts on; he was not breathing.

Jonathan was transported to the hospital by ambulance, and the family followed. As they were leaving the house, James noticed the X on the kitchen floor and asked appellant if that is where she had Jonathan standing in time-out. The X was inches from a big open window. Appellant said yes. James was bothered by her answer because, he said, "not once, not ever" in the eight years of giving "time-out punishments" had they ever made one of the children stand in front of a window "when it's 106 degrees outside in a hot kitchen with food being prepared and the air conditioner not working." In the car, he told appellant he would never forgive her if something happened to his son.

James admitted telling the police in his first interview that it was his idea to put an X on the floor, but he said he was only trying to "cover" for appellant because he was dependent on her. He said he was aware she was restricting Jonathan's water intake on Sunday and Monday, he just did not realize the extent to which she was doing it. He never explicitly heard her tell Jonathan not to drink water. After he was arrested, James saw a photograph of Jonathan at the Saturday birthday party. In the photograph, Jonathan had "sunken eyes" that James said he had not seen at the time.

James also testified that for several years, Jonathan had a "problem with licking his lips" and around his mouth, which would cause severe chapping. The pediatrician told them it was a sign of dehydration, although James believed it "was more of a nervous type thing." As soon as he would see Jonathan licking his lips, James would discourage him and tell him to drink some water. During his July visit, James said Jonathan started licking his lips again but "seemed like he was doing it less."

Joseph testified his brother was in trouble "a lot" in the days before he died, more than either he or appellant's son, B.J. Jonathan would get "whooped" with a belt or paddle or was made to reach for a tack or hold a bag of potatoes over his head. Appellant also sent him to time-

out in the boys' bedroom, which was hot because the window unit was not working. When Jonathan was in trouble, appellant did not allow him to have water. Once or twice, he saw Jonathan drinking from the bathroom faucet. When appellant saw him, she told Jonathan to get out of the bathroom.

On the night before he died, Jonathan was in trouble, and appellant made him sleep in the boys' bedroom with no air conditioning. The next morning, Joseph woke up, and Jonathan was sitting in his time-out "spot" on the living room floor. Appellant would not allow him to lean back. Later that day, he and B.J. went to play outside in the water, but Jonathan was in trouble again and was standing on an X on the kitchen floor. As he was coming back into the house, appellant called for B.J. to help her. Joseph looked in the bathroom and saw Jonathan, in wet clothes, sitting in the bathtub. He said Jonathan looked "exhausted" and "burned up." On the way to the hospital, he heard his father tell appellant he would never forgive her, to which appellant replied, "[H]ow is this my fault."

Joseph testified appellant deprived Jonathan of water for two or three days during time-outs, but he admitted he did not tell the police when they initially talked to him at the hospital. When Jonathan was not in time-out, Joseph said he could have water. Finally, Joseph said that on the day he died, Jonathan's skin "looked darker" and "burned." He was concerned but was "scared" to "do anything," such as use the phone or get help from a neighbor, because appellant might see him.

In contrast to James and Joseph's accounts of what went on in the home in the days before Jonathan died, the defense presented the testimony of B.J. and appellant. B.J. testified he never heard his mother deny water to any one of them when they were in trouble. Water was "free" and was available at any time. He also said he saw Jonathan with a cup of water in his

hand on day before and the day he died. B.J. said Jonathan did not seem different. He noticed Jonathan's lips were chapped, but said "he always pretty much had chapped lips."

On the night Jonathan died, B.J. made him a peanut butter and jelly sandwich and went outside with Joseph. He did not remember Jonathan standing on an X in the kitchen. A couple of minutes later, his mother called for his help. He went inside and saw Jonathan passed out on the floor. B.J. said he helped his mother lift Jonathan into the bathtub while James called 9-1-1. B.J. said they sprinkled Jonathan with cold water. Jonathan opened his eyes momentarily, but then fell back asleep. B.J. got him out of the tub, and he and his mother performed CPR.

B.J. did not recall telling the counselor at the Children's Advocacy Center that Jonathan was getting in trouble a lot around the time he died or that he had to stand on a tack or stand on an X. Instead, he said it was Joseph who was getting in trouble. He also said he did not remember telling the prosecutor that Jonathan was in trouble for three or four days before he died. He also did not remember telling the prosecutor that appellant sent Jonathan to the boys' bedroom without any air conditioning for two or three hours as punishment and sent B.J. in to check on him.

Appellant testified that when she picked up the twins on July 1, Jonathan's lips were not chapped. In the first week, however, he started his "nervous habit" of licking his lips and she told him to drink water. She said she "didn't see it again" for a couple of weeks.

As did other witnesses, she remembered the heat that summer. The house was cooled by window units and fans. The house was "uncomfortable" but not to the point where they were "sweating constantly." Because of the heat, she said the boys played inside, and she gave them ice cream and Popsicles to keep them cooled down. She also covered the windows to "make sure the sun wasn't coming in" and had the boys stay up later at night and sleep later in the morning so that they would "sleep through part of the heat."

Appellant said she and James's home was "more structured" than the twins' home with their mother, so there was an adjustment period when the boys stayed with them. She used time-out as the main form of discipline, which included "standing on the tack" to keep them from "fidgeting and turning around." That summer, she said Joseph, not Jonathan, was getting in trouble more.

According to appellant, Jonathan wet the bed twice in the week before he died—"Tuesday, Wednesday, Wednesday, Thursday." She did not punish him and said she tried to hide it from the other boys so they would not make fun of him. She did, however, begin "limiting" his water at night. She told police she would not allow him to have anything to drink after 9 or 10 p.m.; she testified at trial she cut back liquids for about thirty to forty-five minutes before bedtime and since they did not go to bed until 2 or 3 in the morning, it was much later when she limited his intake. When asked if the boys restricted their own fluid intake, she said it was "possible." She also said the boys were "old enough" that if they were thirsty, they would drink, and she did not feel she "had to hover over a ten-year-old 24 hours a day to make sure he was drinking fluids."

Appellant said in the last week, she placed Jonathan in time-out five or six times—once on Friday and the other times on Sunday and Monday. The time-outs on Sunday involved sitting in time-out, standing on the tack, and taking away his video games. When Jonathan was in time-out, she said he wanted water and she allowed him to have some the first time. He did not sit back down and said he "needed more water." When he did it again, she believed he was "just trying to get out of time-out" and told him he had to finish his time-out first. After time-out, she said he got water.

Jonathan was placed in time-out twice on Monday. The first time, he sat in time-out for about fifteen minutes. The second time, at about 6:30 to 6:45 p.m., appellant had Jonathan stand on the X in the kitchen for about thirty minutes while she was cooking dinner. She said that it

was James's idea to put the X on the floor. Appellant explained that Jonathan started out sitting and watching TV and then he had to stand on the tack. Ultimately, she "gave him a bag that had two small potatoes in it" and told him to hold it over his head. When he did not do that, she told James, and he told her to put the tape on the floor. She "lost track of time" while Jonathan was standing on the X.

Appellant testified she did not see any signs that Jonathan was in trouble from a health standpoint. She said Jonathan was "always quiet" and "didn't do a lot." She said it was "nothing" for him to sit all day. Although the detective suggested she should have recognized he was lethargic, appellant said Jonathan was not "acting any differently" than he did "every other day of his life," so "what signs are there to see?" She testified that if she "had any idea" that "something else was going on," she would have taken him to the emergency room. When showed the pre-autopsy photographs depicting Jonathan's chapped and swollen lips, she said his lips did not look like that when he was taken to the hospital. She denied knowing Jonathan was not feeling well on Saturday and said James lied when he testified that he told her to make a doctor's appointment. She admitted telling Jonathan not to drink from James's water bottle because James had been sick.

On cross-examination, appellant acknowledged she told the detective, in her first interview, that Jonathan was "drinking five, six, seven" cups of water in four or five hours. She also said she understood it was "medically impossible," given that Jonathan had no urine in his bladder. She then explained she "saw him with the cups of water" and saw him "drinking some of it" but did not know "if he drank all of it."

Appellant acknowledged telling the detective she began restricting Jonathan's water on "Tuesday, Wednesday" at 9 or 10 p.m. She also said she did not allow the boys to take water into their bedroom and did not allow Jonathan to drink water at the dinner table when he was not

eating; she also knew Jonathan was not eating on Sunday and Monday. Appellant admitted telling the detective that Jonathan was "a little terror" at the end of the month and was in time-out Friday, Saturday, and Sunday, although she said James told her Jonathan was in trouble on Friday. As for the bag of potatoes she required Jonathan to hold while in time-out on Monday, she acknowledged telling the detective it was a five-pound bag of Russet potatoes, but explained at trial the bag had only two potatoes in it. She also said she "may have" told the detective that Jonathan wanted to sleep in the bedroom with no air conditioning, and she allowed him to but had B.J. check on him.

Finally, appellant said she was aware a person could not go for days without water. She also knew that if it was 104 degrees outside and was hot inside a non-air conditioned house, the people inside the house needed to stay hydrated. If water was restricted under such conditions, she knew there could be problems. She acknowledged times when Jonathan asked for water and she would not let him have any, such as when he was in time-out, when he was drinking from his father's water bottle, and when he was drinking from the bathroom faucet. She also said that when someone in her household needed water, "they went and got it." She conceded that "something possibly can happen" when a person does not have adequate water, such as heat stroke or heat exhaustion.

In the indictment, appellant was charged with intentionally and knowingly causing serious bodily injury to Jonathan by two omissions: failing to seek prompt medical attention and failing to provide adequate hydration. The indictment also alleged she had a legal and statutory duty to act and had assumed care, custody, and control of Jonathan. *See* TEX. PENAL CODE ANN. § 22.04(b)(1), (2). On the first day of trial, the trial court granted the State's motion to strike from the indictment the culpable mental state of "intentionally" and the allegation of failing to seek prompt medical attention. Thus, the only conduct before the jury was the allegation of

-12-

failing to provide adequate hydration. After hearing the evidence, the jury convicted appellant of the lesser-included offense of reckless injury to a child.

In her first issue, appellant contends the evidence is legally insufficient to show she recklessly caused serious bodily injury to Jonathan. She contends the medical experts explained it took several days of water restriction to "have the results they observed" in Jonathan, and no witness testified she did not allow him to have water for several days. At most, she argues, she restricted Jonathan's water intake for "small periods of timeouts."

In reviewing a challenge to the sufficiency of the evidence, we examine the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic to ultimate facts. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Therefore, when analyzing the sufficiency of the evidence, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Id*. Direct and circumstantial evidence are treated equally. *Id*

A person commits the offense of reckless injury to a child if the person recklessly, by omission, causes a child serious bodily injury, and the person has a legal or statutory duty to act or has assumed care, custody, or control of the child. TEX. PENAL CODE ANN. § 22.04(a)(1), (b)(1), (2) (West Supp. 2013). "Child" means a person 14 years of age or younger. *Id*. § 22.04(c)(1). "Serious bodily injury" means bodily injury that creates a substantial risk of death or that causes death . . .." TEX. PENAL CODE ANN. § 1.07(46) (West Supp. 2013).

Injury to a child is a result-oriented offense requiring a mental state that relates not to the specific conduct but to the result of that conduct. *Williams v. State*, 235 S.W.3d 742, 750 (Tex.

Crim. App. 2007). A person acts recklessly, or is reckless, with respect to a result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the result will occur. TEX. PENAL CODE ANN. § 6.03(c) (West 2011). The risk created "must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." *Id.* Whether an omission involves a substantial and unjustifiable risk "requires an examination of the events and circumstances from the viewpoint of the defendant at the time the events occurred, without viewing the matter in hindsight." *Williams*, 235 S.W.3d at 753 (quoting *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 23 (Tex. 1994)). In short, "[a]t the heart of reckless conduct is conscious disregard of the risk created by the actor's conduct[.]" *Id.* at 751 (quoting *Lewis v. State*, 529 S.W.2d 550, 553 (Tex. Crim. App. 1975)). Regardless of how serious the consequences may be, mere lack of foresight, stupidity, irresponsibility, thoughtlessness, and ordinary carelessness do not suffice to constitute criminal recklessness. *Id.* at 751.

Considering the evidence in the light most favorable to the verdict, it showed the following. Jonathan's lips were swollen and chapped and his eyes sunken in from dehydration, a condition that did not happen overnight. When he arrived at the hospital, multiple organs were failing, including his kidneys, and his bladder had no urine. The medical examiner testified he died of dehydration, which did not occur over the course of one day, but over multiple days. Further, the undisputed evidence was appellant had acted as Jonathan's caregiver that July.

On the days leading up to Jonathan's death, appellant, by her own admission, restricted his water when he was in timeout, at the dinner table, and at night. Further, the evidence showed Jonathan was in trouble "a lot." His punishment included (1) standing on a spot while reaching over his head for a tack, (2) standing on an X in front of a big open window in the kitchen when

the temperature was over 100 degrees, and (3) standing with a five-pound sack of potatoes over his head. At other times, he was sent to his bedroom, which was not air conditioned, and was made to sleep there one night.

By Saturday, Jonathan was not feeling well and told his father; appellant was aware of the conversation. That day, his father noticed Jonathan seemed lethargic, and told appellant she needed to call the doctor's office if he was not feeling better. The next day, Jonathan again said he did not feel well and his father realized for the first time appellant was denying him water. That night, appellant made Jonathan sleep in his bedroom without air conditioning and no water. On the day he died, appellant stood Jonathan in a hot kitchen, in front of an open window, with the temperature at 104, first holding a sack of potatoes over his head and then standing on the X. Not long after, Jonathan collapsed.

Given the visible signs of dehydration and his medical condition upon arrival at the hospital, the jury could have believed appellant disregarded the signs and, in fact, escalated his condition when she had made him sleep in a non-air conditioned bedroom, after denying him water, and forced him to stand in front of an open window as punishment when the temperature exceeded 100 degrees. Although appellant claimed Jonathan could have all the water he wanted, except when he was in timeout, the jury did not have to believe her testimony. Nor did they have to believe her testimony that Jonathan's lips were not swollen and chapped when emergency medical personnel transported him to the hospital. Rather, the jury could have believed the testimony of Dr. Cox, who said the people around Jonathan would have seen the child's thirst, his chapped and dried lips, sunken eyes, confusion, lack of tears, and lack of urination. Considering all the evidence in the light most favorable to the verdict, we conclude a reasonable jury could have found beyond a reasonable doubt that appellant recklessly caused serious bodily

injury to Jonathan by failing to provide him with adequate hydration. We therefore overrule the first issue.

In her second issue, appellant argues the trial court erred by admitting an autopsy photograph she contends was "gruesome" and "prejudicial," in violation of Texas Rule of Evidence 403.

The admission of a photograph over an objection is within the sound discretion of the trial court. *Sonnier v. State*, 913 S.W.2d 511, 518 (Tex. Crim. App. 1995). Generally, a photograph is relevant if verbal testimony concerning the matter depicted in the photograph is relevant. *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007). Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Id.* But, otherwise relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *Id.* In determining whether the probative value of a photograph is substantially outweighed by the danger of unfair prejudice, a court may consider several factors, including "the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or black-and-white, whether they are close-up, whether the body depicted is clothed or naked, the availability of other means of proof, and other circumstances unique to the individual case." *Williams v. State*, 301 S.W.3d 675, 690 (Tex. Crim. App. 2009).

Two photographs of the child, after death, were admitted into evidence. Exhibit 3 is the autopsy identification photograph and is not at issue. Exhibit 12 is at issue and is a pre-autopsy, close-up photograph of Jonathan's face showing the condition of his lips. The record does not reflect whether the photograph shown to the jury was in color or its size. The copy in our record is black and white and is about 8" x 10." Dr. Barnard, the medical examiner, testified the

photograph would aid him in the presentation of his opinion and used the photograph in his testimony to show the jury Jonathan's swollen and chapped lips.

Dr. Barnard testified that during the autopsy, he did not observe any external or internal injuries that would account for Jonathan's death. He noted Jonathan's chapped and swollen lips, which he said was not "in and of itself definitive of a specific cause of death." But, he said chapped lips are seen in dehydration, and later information with regard to the high sodium level, as well as other findings from fluids removed during the autopsy, "corresponded with that." Ultimately, he found Jonathan had dehydration caused by an absence of water and, based on investigative information, that Jonathan's water was restricted.

To obtain a conviction, the State had to prove appellant either knowingly or recklessly caused serious bodily injury to Jonathan by failing to provide adequate hydration. The photograph was evidence that Jonathan presented at the hospital with obvious, external signs of severe dehydration and was probative of the question of appellant's culpability. As testified to by Dr. Barnard, Jonathan's lips showed "more of a crusting older lesion" that was not the result of attempts by medical personnel to save his life. A jury could have believed, from looking at the photograph, that appellant would have seen this visible sign of dehydration and concluded she had the requisite culpable mental state to have committed the offense.

Finally, the photograph is not particularly gruesome and simply portrays the condition of his lips. But any gruesomeness can be attributed to the subject matter it depicts –the death of a ten-year-old boy by dehydration–and is no more gruesome than one would expect in this sort of crime. *See Gallo*, 239 S.W.3d at 763. Under the circumstances, we conclude the probative value of the photograph is not substantially outweighed by the danger of unfair prejudice. The trial court's decision to admit this evidence was within the zone of reasonable disagreement and was not an abuse of discretion. We overrule the second issue.

In her third issue, appellant argues the trial court reversibly erred by denying her request for a jury instruction on criminally negligent injury to a child, which she contends is a lesser-included offense of recklessly causing injury to a child.

Appellant was charged with causing serious bodily injury to a child by omission, specifically by failing to provide Jonathan with adequate hydration. Under section 22.04 of the Texas Penal Code, a person commits an offense if she "intentionally, knowingly, recklessly, or with criminal negligence, by act" causes serious bodily injury to a child. TEX. PENAL CODE ANN. § 22.04(a)(1) (emphasis added). But if the offense involves an omission, rather than an act, a person commits an offense only if she intentionally, knowingly, or recklessly causes serious bodily injury to a child. *See id.* Negligence is not one of the culpable mental states for injury to a child by omission. *See id.* Consequently, an individual who, with criminal negligence, causes serious bodily injury to a child by omission, commits no offense. *Rankin v. State*, 41 S.W.3d 335, 348 (Tex. App.—Fort Worth 2001, pet. ref'd).

Because criminally negligent injury to a child by omission is not a criminal offense under our law, appellant was not entitled to her requested charge as a lesser included offense and the trial court did not err in refusing her instruction. We overrule the third issue.

We affirm the trial court's judgment.

Do Not Publish
TEX. R. APP. P. 47
130121F.U05

/Molly Francis/
MOLLY FRANCIS
JUSTICE



# Court of Appeals
## Fifth District of Texas at Dallas
### JUDGMENT

TINA MARIE ALBERSON, Appellant

No. 05-13-00121-CR    V.

THE STATE OF TEXAS, Appellee

On Appeal from the 363rd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F-1159105-W.
Opinion delivered by Justice Francis;
Justices Bridges and Myers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered November 6, 2014